# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| EUFROSINA DIACONU, | ) |
| | ) |
| Plaintiff | ) |
| | ) Civil Action No.:07CV01358 (EGS) |
| v. | ) |
| | )ECF |
| ROBERT GATES, Secretary of Defense; | ) |
| U.S. DEPARTMENT OF DEFENSE; | ) |
| and STEVE JOHNSTON, | ) |
| Administrator, U.S. Environmental | ) |
| Protection Agency, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## THE UNITED STATES' MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

Pursuant to Federal Rule of Civil Procedure 12(b)(1), the United States of America moves to dismiss this suit for lack of subject matter jurisdiction.

A proposed order consistent with this Motion is also attached hereto.

Date: January 4, 2008

Respectfully Submitted,

_____/s/_____

JEFFREY BUCHOLTZ
Acting Assistant Attorney General
Civil Division

J. PATRICK GLYNN
  DC Bar # 219162
Director

DAVID S. FISHBACK
  D.C. BAR #182907
Assistant Director
Torts Branch (Environmental Torts)
Civil Division
United States Department of Justice
1331 Pennsylvania Ave., NW
  Suite 800 South

ANDREW RICHARDS                     Washington, D.C. 20004
Trial Attorney                             Tel: 202-616-4206/Fax 202-616-4473
                                           David.Fishback@usdoj.gov
                                           Attorneys for Defendants

2

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| EUFROSINA DIACONU, | ) |
| | ) |
| Plaintiff | ) |
| | ) Civil Action No.:07CV01358 (EGS) |
| v. | ) |
| | )ECF |
| ROBERT GATES, Secretary of Defense; | ) |
| U.S. DEPARTMENT OF DEFENSE; | ) |
| and STEVE JOHNSTON, | ) |
| Administrator, U.S. Environmental | ) |
| Protection Agency, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## MEMORANDUM IN SUPPORT OF THE UNITED STATES' MOTION TO DISMISS

Pursuant to Federal Rule of Civil Procedure 12(b)(1), the United States of America moves to dismiss this suit for lack of subject matter jurisdiction.[1]  We will show below that this suit must be dismissed for failure to exhaust administrative remedies under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-80 ("FTCA").

---

[1]As explained in Part III Section A, this action should be treated as having been brought against the United States.

## I.     BACKGROUND

This is the latest lawsuit in a long-running series of unsuccessful actions

brought by *pro se* plaintiff Eufrosina Diaconu[2] against officers and agencies of the

federal government.[3]  Ms. Diaconu resides in Philadelphia, Pennsylvania, and is a

former civilian employee of the Defense Supply Center Philadelphia ("DSCP"), a

component of the U.S. Department of Defense's ("DOD") Defense Logistics

Agency ("DLA").  She alleges in her Complaint that she was diagnosed with

cancer in May 2006 and ties the cancer to her exposure to chemicals while

employed at DSCP between July 1990 and May 1995, when she was removed

from her job.  Complaint at ¶ 17.  While her Complaint does not state a basis for

any waiver of sovereign immunity on the part of the federal government, the

Complaint asserts causes of action in tort, and faults DOD and the U.S.

Environmental Protection Agency ("EPA") for allegedly failing to protect the

health of Diaconu and other workers at DSCP.  *Id.* at ¶¶ 17-26.  She names as

---

[2]The plaintiff lists her name in the Complaint's caption as "Diaconu Eufrosina," thus suggesting that her first name is "Diaconu" and her surname is "Eufrosina," but her first name is in fact "Eufrosina" and her surname is "Diaconu."  She will be referred to in this memorandum as "Ms. Diaconu."

[3]*See Diaconu v. Defense Logistics Agency*, 2007 WL 966506 (E.D. Pa.) (Exh. A), and the court's Memorandum and Order in *Diaconu v. Department of Defense,* Civil Action No. 03-3405 (E.D. Pa., Nov. 14, 2005) (Exh. B, at 1-5), for the background of her earlier lawsuits.

defendants DOD; Robert Gates, Secretary of Defense; and Steve Johnston, EPA

Administrator.  She also purports to represent a class of former DSCP employees.

*Id.* at ¶¶ 9-16.

The alleged exposure at issue in this case evidently is the same exposure

involved in a 1998 state law and constitutional tort action that Ms. Diaconu

brought against DLA and various federal officials in the United States District

Court for the Eastern District of Pennsylvania.  *See Diaconu v. Defense Logistics*

*Agency*, 2007 WL 966506 (E.D. Pa.) (Judge Louis Pollak) (Exh. A), on remand

from 33 Fed.Appx. 647 (3d Cir. 2002) (unpublished decision attached as Exh. C).

As Judge Pollak and the Third Circuit explained, Ms. Diaconu brought a tort suit

in December 1998 against various federal defendants, asserting injuries arising

from alleged exposure to toxic materials from 1990 to 1995, while she was an

employee of the DSCP.  The Third Circuit held that those allegations were time-

barred, since she was aware of both her exposure and injuries while working there,

certainly no later than December 2005.  Exh. C at 4-5.  The Third Circuit noted,

however, that Ms. Diaconu might be able to avoid the statute of limitations bar

were she able to allege an injury that did not manifest itself until more recently.

*Id.* at 6 n.4.  And, on March 27, 2007, Judge Pollak, while denying Ms. Diaconu's

effort to reopen her 1998 case, stated that she was free to "file a new tort action on the basis of her cancer diagnosed in 2006." 2007 WL 966506, at * 5.

Contrary to what might have been expected, Ms. Diaconu did not file a new tort action in the Eastern District of Pennsylvania. Instead, she filed four motions in that court to transfer venue to this Court. In orders dated March 29, 2007 (Exh. D), and April 16, 2007 (Exh. E), Judge Pollak dismissed all four motions as moot and restated his conclusions that Ms. Diaconu could not reopen her 1998 case, but could file a new tort action based on her 2006 cancer. At no point did Judge Pollak give Ms. Diaconu his "approval" to file suit in this Court, as she states in her Complaint at paragraph 8.

On May 14, 2007, Ms. Diaconu filed a Standard Form 95 Administrative Claim for Damage, Injury, or Death with DOD. Exh. F. She claimed $15 million in personal injury damages and described the basis of her claim as follows:

> 1990-1995 exposed to ultrahazardous chemicals and materials that caused irreversible damages to my CNS and other health injuries including but not limited to cancers diagnosed in 2006 and to my irreversible total and permanent disability since February 1995.

*Id.* at Item 8. She further explained that

> [t]he instant CLAIM FOR DAMAGE AND INJURY **DOES NOT** address the cancer I was diagnosed with in May 2006. The cancer issue will become the subject of a new and improved class action toxic tort complaint to be filed in the U.S. District Court for The District of Columbia. On

4

March 2007 the Hon. LOIS H. POLLAK, U.S. District Court For The Eastern District of Pennsylvania has approved the new class action toxic tort to be filed in the District of Columbia.

The instant CLAIM FOR DAMAGE AND INJURY **ADDRESSES ONLY** the issues subject to the following complaints filed pro se and in forma pauperis: DIACONU v. DLA No. 03-3405 (E.D. Pa.); DIACONU & BUTLER v. DLA/DPSC, CLASS ACTION TOXIC TORT No. 98-06533 (E.D. Pa.); DIACONU v. DLA/DPSC No. 95-0214 (E.D. Pa.) and DIACONU v. DLA/DPSC No. 94-7273 (E.D. Pa.) all of which at the specific request made by the U.S. Attorney's Office Philadelphia, with impunity, ignoring the facts and the direct evidences, the E.D. Pa. dismissed these cases. Not only that the cases were assigned to judges that were very old but, they were so mentally, emotionally and physically deteriorated that were NOT capable to make a rational judicial judgement. Case in point is the late Hon. C. Weiner, presiding judge on DIACONU & BUTLER v. DLA/DPSC CLASS ACTION TOXIC TORT case No. 98-6533 (E.D. Pa.). On appeal the U.S. Court For Appeals For The 3rd. Circuit tried to settle the case with DIACONU & BUTLER but the U.S. Attorney's Office Philadelphia refused to settle.

*Id.* at Attachment (emphases in original).

Diaconu's administrative claim is still pending. *See* Affidavit of Edyta Czerniak, Exh. G.

Although the FTCA clearly states that a claimant may not proceed in court until either the claim has been denied or until six months have passed from the time the claim was submitted, 28 U.S.C. § 2675(a), Ms. Diaconu filed the instant action on July 25, 2007, while her administrative claim was still pending and just over two months after she submitted it. Exh. F. Ms. Diaconu served the Attorney

General of the United States on November 5, 2007, and the United States Attorney for the District of Columbia on November 6, 2007.

## II.    STANDARD FOR A RULE 12(b)(1) MOTION TO DISMISS

"A motion to dismiss under [Rule] 12(b)(1) . . .  raises the fundamental question of whether the federal district court has subject matter jurisdiction over the action before it." 5B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1350 (3d ed. 2004) (collecting citations) [hereinafter "WRIGHT & MILLER"].  "Because subject matter jurisdiction deals with the power of the court to hear the plaintiff's claim in the first place, a Rule 12(b)(1) motion imposes on the court an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority." *Fowler v. Dist. of Columbia*, 122 F. Supp. 2d 37, 40 (D.D.C. 2000) (citation omitted).  *Accord Fed. Election Comm'n v. Nat'l Rifle Ass'n*, 553 F. Supp. 1331, 1343-44 (D. D.C. 1983); *Steel Co. v. Citizens for a Better Gov't*, 523 U.S. 83, 93-95 (1998) (courts must resolve jurisdictional issues as a threshold matter before addressing the merits of a case).

A court may satisfy that obligation in two ways.  First, it may determine the motion based solely on the complaint.  *Herbert v. Nat'l Acad. of Sciences*, 974 F.2d 192, 197 (D.C. Cir. 1992).  Alternatively, it may look beyond the complaint's

allegations to affidavits and other extrinsic information, and if necessary weigh

any conflicting evidence.  *Id.*

## III.  ARGUMENT

### A.  This Suit Should Be Construed As An FTCA Action Against The United States

The United States "can only be sued to the extent that it has waived its

immunity." *United States v. Orleans,* 425 U.S. 807, 814 (1976).  Congress has

provided a limited waiver of sovereign immunity for non-maritime torts only

under the FTCA, 28 U.S.C. §§ 2674, 2679 (a) & (b)(1).  Ms. Diaconu does not cite

the FTCA in her Complaint, but this action should be construed as having been

brought under the FTCA because it is captioned as a "TOXIC TORT CLASS

ACTION"; its allegations pertain to personal injuries Diaconu allegedly suffered

due to the allegedly wrongful acts of federal agencies; and it demands money

damages from federal agencies.  *See* 28 U.S.C. § 1346(b) (FTCA section providing

federal district courts with exclusive jurisdiction over "civil actions on claims

against the United States, for money damages, [for] personal injury or death

caused by the negligent or wrongful act or omission of any employee of the

Government while acting within the scope of his office or employment").  So

construed, the named defendants (DOD, Secretary Gates, Administrator Johnston)

7

should be dismissed and the United States should be considered the sole

defendant, because the United States is the only proper defendant in an FTCA

action.  28 U.S.C. § 2679; *Kennedy v. U.S. Postal Service,* 145 F.3d 1077, 1078

(9th Cir. 1998); *Scheimer v. Nat'l Capital Region, NPS*, 737 F. Supp. 3, 4 (D.D.C.

1990) (citations omitted).[4]

**B.**    **This Court Lacks Subject Matter Jurisdiction Because Diaconu Failed To Exhaust Her Administrative Remedies**

As the Supreme Court held in *McNeil v. United States*, 508 U.S. 106, 113

(1993), "[t]he FTCA bars claimants from bringing suit in federal court until they

have exhausted their administrative remedies."  To exhaust administrative

remedies, a claimant must have presented her claim to the appropriate federal

agency and 1) the agency must have denied the claim or 2) six months must have

passed from the date the claim was filed without the agency having disposed of it.

---

[4]Ms. Diaconu makes a single reference, in the jurisdictional section of the Complaint, to *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971), but this is not a *Bivens* action against Secretary Gates and Administrator Johnston because the Complaint is devoid of any allegations regarding constitutional violations.  And even if *Bivens* claims were read into the Complaint, they would be subject to dismissal for lack of subject matter jurisdiction because Secretary Gates and Administrator Johnston have been sued in their official, as opposed to their individual, capacities, inasmuch as they were not in office during Ms. Diaconu's employment at DSCP (1990-1995) and Ms. Diaconu demands compensation from their respective agencies rather than from them.  *McCloskey v. Mueller*, 446 F.3d 262, 271-72 (1st Cir. 2006) (citing *Ruiz Rivera v. Riley*, 209 F.3d 24, 28 (1st Cir. 2000)).

28 U.S.C. § 2675(a).   Specifically, *McNeil* held that if an FTCA action is brought in federal court prior to the denial of the administrative claim and less than six months after the administrative claim was submitted, the complaint must be dismissed.  508 U.S. at 110-12.  This is true even if more than six months have passed from the time the claim was submitted and no significant work on the case has occurred in court.  *Id*. at 111-12.

Here, Ms. Diaconu failed to exhaust her administrative remedies in two ways.  First, she never presented the claim that is the basis of her Complaint – her 2006 cancer – to a federal agency, as she explicitly excluded her cancer from the scope of the only administrative claim she filed with a U.S. agency.  Exh. F at Attachment.  Second, even assuming she adequately presented that claim (and any other she may be advancing now), she filed suit in this Court too soon.  On July 25, 2007, the day she filed her Complaint, her May 14, 2007, administrative claim had not been denied and just over two months, rather than the required six months, had passed since she submitted the claim.  These two failures to exhaust administrative remedies mean Ms. Diaconu's Complaint is barred and this action must be dismissed for lack of subject matter jurisdiction.[5]

---

[5]Furthermore, to the extent Ms. Diaconu seeks recovery for ailments other than her cancer, she is barred by the doctrine of *res judicata*, since such claims were litigated in and dismissed by the Eastern District of Pennsylvania and that

**C.    This District Is An Improper Venue But This Action Should Not Be Transferred To The Proper Venue Because That Would Not Cure The Lack Of Subject Matter Jurisdiction**

Section 1402(b) of Title 28 provides that "[a]ny civil action on a tort claim against the United States under [the FTCA] may be prosecuted only in the judicial district where the plaintiff resides or wherein the act or omission complained of occurred."  Since Ms. Diaconu resides in Philadelphia, Pennsylvania (Complaint at ¶ 17), and was allegedly injuriously exposed to toxic materials while working in Philadelphia (*id*.), venue may lie only in the United States District Court for the Eastern District of Pennsylvania.

But rather than transferring this action to the proper venue, this Court should dismiss it outright because transferring it would not cure the lack of subject matter jurisdiction due to Ms. Diaconu's failure to exhaust administrative remedies.  14D WRIGHT & MILLER § 3827 (3d ed. 2007) (collecting citations) ("A district judge may not order a transfer under [28 U.S.C. § 1406(a)] unless the court has jurisdiction of the subject matter of the action, although [28 U.S.C. § 1631]

---

dismissal was affirmed by the Third Circuit.  *See* Exh. C.

10

does allow a court lacking subject matter jurisdiction to cure the jurisdictional problem through transfer.").[6]

## D.    This Case May Not Proceed As A Class Action

The claims Ms. Diaconu purports to bring on behalf of a class of similarly situated people must be dismissed because a) Diaconu, as a *pro se* plaintiff, may not represent anyone other than herself in federal court, 28 U.S.C. § 1654; and b) there is no evidence each member of the putative class has filed an administrative claim, as is required under law.  On the second point, this Court, in *Hohri v. United States*, 586 F. Supp. 769, 793 (D.D.C. 1984) (citation omitted), *aff'd in relevant part and rev'd in part on other grounds*,782 F.2d 227 (D.C. Cir. 1986), *vacated on other grounds and remanded by United States v. Hohri*, 482 U.S. 64 (1987), rejected plaintiffs' argument that the claim filing requirements ought to be excused for impracticality given the size of the class, explaining that it "is bound to respect conditions placed by Congress on a waiver of sovereign immunity, particularly when those conditions are expressed in clear and forceful language.

---

[6]We also note that Ms. Diaconu alleges that her injuries were incurred in the performance of her duties as a federal civilian employee.  While the Court need not reach this issue, we note that, given her allegations, Ms. Diaconu's sole recourse against the United States would be for workers' compensation benefits under the Federal Employees' Compensation Act, 5 U.S.C. §§ 8101, 8116(c).  *See Spinelli v. Goss*, 446 F.3d 159, 161 (D.C. Cir. 2006).

The filing requirement applies to all claims, including class actions." Similarly, the Second Circuit in *In re Agent Orange Products Liability Litigation*, 818 F.2d 194, 198 (2d Cir. 1987), rejected an effort to assert a class action under the FTCA, where "the prerequisites of suit have not been satisfied by or on behalf of each individual claimant."

## IV.  CONCLUSION

For reasons stated herein, the United States respectfully requests that the Court dismiss this action for lack of subject matter jurisdiction.

Date: January 4, 2008                          Respectfully Submitted,

                                              _____/s/_____

JEFFREY BUCHOLTZ                               DAVID S. FISHBACK
Acting Assistant Attorney General              D.C. BAR #182907
Civil Division                                 Assistant Director
                                               Torts Branch (Environmental Torts)
J. PATRICK GLYNN                               Civil Division
  DC Bar # 219162                              United States Department of Justice
Director                                       1331 Pennsylvania Ave., NW
                                                 Suite 800 South
ANDREW RICHARDS                                Washington, D.C. 20004
Trial Attorney                                 Tel: 202-616-4206/Fax 202-616-4473
                                               David.Fishback@usdoj.gov
                                               Attorneys for Defendants

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| EUFROSINA DIACONU, | ) |
| | ) |
| Plaintiff | ) |
| | ) Civil Action No.:07CV01358 (EGS) |
| v. | ) |
| | )ECF |
| ROBERT GATES, Secretary of Defense; | ) |
| U.S. DEPARTMENT OF DEFENSE; | ) |
| and STEVE JOHNSTON, | ) |
| Administrator, U.S. Environmental | ) |
| Protection Agency, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## THE UNITED STATES' MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

Upon consideration of the United States' Motion to Dismiss for Lack of Subject Matter Jurisdiction, the Opposition thereto, and the entire record herein, it is this _____ day of _____, 2008,

ORDERED that the United States' Motion to Dismiss for Lack of Subject Matter Jurisdiction be and is hereby GRANTED; and it is

FURTHER ORDERED that the above-captioned action be and is hereby DISMISSED.

SO ORDERED.


_____
U.S. District Judge

# EXHIBIT A

**Diaconu v. Gates, et al.**
**Civil Action No. 07-1358 (EGS)**

Slip Copy                                                                                    Page 1
Slip Copy, 2007 WL 966506 (E.D.Pa.)
**(Cite as: Slip Copy)**

H

Diaconu v. Defense Logistics
E.D.Pa.,2007.
Only the Westlaw citation is currently available.
United States District Court,E.D. Pennsylvania.
Eufrosina DIACONU et al., Plaintiffs,
v.
DEFENSE LOGISTICS et al., Defendants.
**Civil Action No. 98-6533.**

March 27, 2007.

Eufrosina Diaconu, Philadelphia, PA, pro se.
Butler S. Dorothy, Philadelphia, PA, pro se.
James G. Sheehan, U.S. Attorney's Office, Philadelphia, PA, Stephen J. Britt, Donnelly & Associates, Conshohocken, PA, for Defendants.

**MEMORANDUM/ORDER**

LOUIS H. POLLAK, J.

**\*1** Now before the court is Eufrosina Diaconu's "Motion for Reconsideration or in Alternate Motion for Permission to File a New Toxic Tort Claim."Diaconu's motion relates to *Diaconu et al. v. Defense Logistics et al.,* Civil Action No. 98-6533, a civil suit filed in 1998 by Diaconu and her co-plaintiff Dorothy Butler. [FN1]For the reasons given below, I will deny Diaconu's motion for reconsideration but allow Diaconu to file a new tort action on the basis of her recently-developed cancer. I will also vacate the order filed on January 8, 2007, Docket # 47, to the extent that it denied Butler's motion to reopen her portion of this case.

> FN1. Diaconu, but not Butler, is also a plaintiff in the similarly titled *Diaconu v. Defense Logistics et al.,* Civil Action No. 96-214 (an employment discrimination lawsuit).

**I. *Overview***

On April 24, 2006, plaintiff Dorothy Butler filed a "motion to reopen" this civil action. The case, which had been on the docket of my late colleague Judge Weiner, was then transferred to my docket on

April 25, 2006. Shortly thereafter, on May 5, 2006, Butler's co-plaintiff Eufrosina Diaconu filed a motion to reopen her portion of the case.

In considering these motions, I observed that "[p]laintiffs, who are proceeding *pro se,* do not indicate under what authority they request relief from this court or, in fact, specify what relief they seek."Docket # 47 at 2. [FN2] The docket report for the case set out the following procedural history: In December of 1998, Butler and Diaconu filed a complaint against defendants Defense Logistics Agency (DLA), Defense Personnel Supply Center Philadelphia (DPSC), the United States Secretary of Defense, the Environmental Protection Agency (EPA), the EPA Administrator, and the Director of the Office of Health, Safety, and the Environment. On April 2, 1999, Judge Weiner dismissed the complaint with prejudice, as time-barred, pursuant to Federal Rule of Civil Procedure 12(b)(6). Docket # 31. On May 3, 1999, Judge Weiner denied plaintiffs' motion for reconsideration with prejudice. Docket # 35. In June of 1999, plaintiffs filed a notice of appeal. Docket # 37. On July 9, 2002, the Clerk of this Court docketed a judgment from the Third Circuit stating that "the judgment of the District court entered 4/2/99 be and the same is hereby affirmed in part and reversed and remanded in part."On that same date, the Clerk also closed this case for statistical purposes. The Federal Appendix lists the judgment of April 2, 1999 as having been affirmed without a published opinion. 33 Fed. Appx. 647 (3d Cir.2002).

> FN2. Butler's motion to reopen consisted of the statement that "I Dorothy S. Butler am requesting for the courts to plase [sic] reopen my case."Docket # 42. Diaconu's motion to reopen recited that Diaconu was diagnosed with uterine cancer in May of 2006; that "[s]ince th[is] case was filed, new evidences came to light which only support the existing direct evidences allready in the file, evidences that have been previously ignored by the U.S. dis-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

trict court"; and that "[s]ince th[is] case was filed, on the same ground as the instant case defendant has been found to be toxic-liabled to the Commonwealth of Pennsylvania and to the Philadelphia Housing."Docket # 44.

On the basis of this procedural history, I understood plaintiffs-in their motions of April 24, 2006 and May 5, 2006-to be seeking "relief from the district court order dismissing their complaint."Docket # 47 at 2. Thus, I "consider[ed] their motions in light of Federal Rule of Civil Procedure 60(b), which sets out the circumstances under which a court may grant relief from a judgment or order."Id. Applying the standards of Rule 60(b) (2) (authorization to grant relief based on "newly discovered evidence") and Rule 60(b)(6) (authorization to grant relief for "any other reason justifying relief from the operation of the judgment"), I concluded that plaintiffs could not obtain relief under either provision. Id. Accordingly, in a memorandum and order filed on January 8, 2007, I denied both motions.Id. at 5.

*2 On January 16, 2007, Diaconu filed a "Motion for Reconsideration or in Alternate Motion for Permission to File a New Toxic Tort Claim."Docket # 49. In this motion, Diaconu petitions the court to separate her motion from Butler's on the grounds that Diaconu seeks "to reopen only her portion of the case," while Butler seeks "relief based on the fact that on appeal the [Third Circuit] remanded Butler's portion of the case back to the trial court."Id. at 1. Diaconu also asserts the timeliness of her May 5 motion to reopen, stating that she brought this motion "as soon as (i) she learned that she has cancer and (ii), as soon as she knew that the type of cancer she was diagnosed with ... was caused by the ultrahazardous chemicals and materials she was exposed to while she worked for [defendants Defense Logistics Agency (DLA) and Defense Personnel Support Center (DPSC) ] in Philadelphia."Id. at 2. Finally-in the event that this court declines to reconsider its decision of January 8-Diaconu moves for "specific, clearly spelled out permission to file a new toxic tort case against all defendants" on the basis of "the cancer she was dia-

gnosed with during the 2006 calendar year," in order to "avoid the appearance of res [judicata]."Id.

On February 12, the government filed a response to plaintiff's Motion for Reconsideration, Docket # 50, wherein it reproduces the Third Circuit's unpublished opinion-the first such copy provided to this court. In this opinion, it appears that the Third Circuit concluded the following with respect to Butler's claims:

Although Butler alleges that she was aware of some chemical exposure while working at DPSC, she could not have been aware of the specific injury; i.e., the cancer, until it was diagnosed in 1998. Thus, it appears that under Pennsylvania law, this claim is not time-barred, and we will remand to allow the District Court to consider the claim in the first instance.

Slip Op. 5. The Third Circuit further concluded that the claims brought by Diaconu in her 1998 complaint were time-barred. However, it also noted thatAlthough it is not clear from the submission; it appears that Diaconu may have developed symptoms and/or diseases that she was not aware of at the time the complaint was filed. We express no opinion as to whether a new complaint containing claims based on those symptoms would be barred under the discovery rule. See Zieber[ ] v. Bogert, 565 Pa. 376, 773 A.2d 758, 761 (Pa.2001) (noting that Pennsylvania recognizes the "separate disease" rule for statute of limitations purposes in certain cases[) ].

Id. at 5 n. 4.

## II. Discussion

### A. Motion for Reconsideration

#### (1) Standard for Reconsideration

"Because federal courts have a strong interest in the finality of judgments, motions for reconsideration should be granted sparingly."Continental Casualty Co. v. Diversified Indus., Inc., 884 F.Supp. 937, 943 (E.D.Pa.1995). As the Third Circuit has noted,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 3
Slip Copy, 2007 WL 966506 (E.D.Pa.)
**(Cite as: Slip Copy)**

"[t]he purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence."*Harsco Corp. v. Zlotnicki,* 779 F.2d 906, 909 (3d Cir.1985). Thus, **\*3** [a]lthough federal courts always retain the discretion to reconsider issues already decided in the same proceeding, *see Deisler v. McCormack Aggregates Co.,* 54 F.3d 1074, 1086 n. 20 (3d Cir.1995); 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure: Jurisdiction, § 4478 at 789-90, courts will reconsider an issue when there has been an intervening change in the controlling law, when new evidence has become available, or when there is a need to correct a clear error or prevent manifest injustice. 18 Wright, Miller & Cooper, § 4478 at 790.

*NL Industries, Inc. v. Commercial Union Ins. Co.,* 65 F.3d 314, 324 n. 8. (3d Cir.1995).

### (2) This Court's Order of January 8, 2007

There has been no change in controlling law since this court denied plaintiffs' motions to reopen. Nor have plaintiffs presented the court with evidence that was "unavailable" or "unknown to [plaintiffs] at the time" they filed their motions. *DeLong Corp. v. Raymond Intern., Inc.,* 622 F.2d 1135, 1140 (3d Cir.1980), *overruled on other grounds by Croker v. Boeing Co.,* 662 F.2d 975, 983 (3d Cir.1981). However, there does seem to be a need to correct a clear error with respect to my disposition of Butler's motion. The Third Circuit, on appeal, determined that Butler's claims were not time-barred and remanded her portion of the case for further proceedings consistent with its opinion. This instruction has not, hitherto, been carried out due to the Clerk's Office's erroneous closure of this case, the unfortunate death of Judge Weiner, and Butler's inability-given her lack of sophistication and *pro se* status-to clearly articulate why her portion of the case should be reopened. Under these circumstances, reconsideration of my earlier decision seems necessary to prevent injustice to Butler. Accordingly, I will vacate the order filed on January 8 as it relates to Butler's motion to reopen.

I see no corresponding error or injustice with respect to my disposition of Diaconu's motion to reopen. The Third Circuit, agreeing with Judge Weiner's determination that Diaconu's claims were time-barred, affirmed the district court judgment dismissing Diaconu's portion of the case. Accordingly, when Diaconu filed her May 5, 2006 motion to reopen, she was-as this court supposed-seeking "relief from the district court order dismissing [her] complaint." For that reason, the memorandum and order of January 8 constituted appropriate review of Diaconu's motion to reopen. In addition, Diaconu's motion for reconsideration does not point to any factual or legal issues that were properly presented but overlooked by the court. Therefore, in accordance with the Third Circuit's holdings in *Harsco Corp.* and *NL Industries,* I decline to reconsider the order of January 8 as it relates to Diaconu's motion to reopen. *Cf. Glendon Energy Co. v. Borough of Glendon,* 836 F.Supp. 1109, 1122 (E.D.Pa.1993) ("Mere dissatisfaction with the Court's ruling is not a proper basis for reconsideration.").

### B. Motion For Permission to File a New Suit

**\*4** In the event that this court denies her motion for reconsideration, Diaconu intends to file a new tort action on the basis of "the cancer she was diagnosed with during the 2006 calendar year." However, to "avoid the appearance of res [judicata]," Diaconu has petitioned the court for "specific, clearly spelled out permission" to do so. The government, in its response to this motion, argues that "plaintiff's personal injury claim against the government accrued during the early 1990s ... [when] her injuries ... were sustained. The full extent to those injuries, *i.e.,* the alleged cancer, was not necessary to be known as of that time." Docket # 50 at 8-9.

In *Marinari v. Asbestos Corp.,* 417 Pa.Super. 440, 612 A.2d 1021, 1022 (Pa.Super.1992), the Pennsylvania Superior Court determined that Pennsylvania's two-year statute of limitations for actions based on negligence and intentional exposure to a hazardous substance, 42 Pa.C.S.A. § 5524, should not "bar [ ] an action for lung cancer where

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 966506 (E.D.Pa.)
**(Cite as: Slip Copy)**

the action was filed within two years of the cancer diagnosis but four years after [another asbestos-related disease] had been discovered."*Id.* at 1022;*see also id.*("Plaintiff's discovery of [an asbestos-related disease] ... does not trigger the statute of limitations with respect to an action for a later, separately diagnosed, disease of lungcancer.") As the court explained, while Pennsylvania courts "have generally followed the rule that all claims against a defendant arising from a single transaction or occurrence must be asserted in a single action," this approach does not serve the interests of justice in "latent disease cases." *Id.* at 1027.Accordingly, the Superior Court decided to "join a majority of jurisdictions ... by holding that an asbestos plaintiff may assert, in a second lawsuit, a claim for a distinct, separate disease if and when it develops at a later time."*Id.* at 1028.The Pennsylvania Supreme Court has approved this holding on several occasions. *See, e.g., Zieber v. Bogert,* 565 Pa. 376, 773 A.2d 758, 761 (Pa.2001) (noting that the " 'two-disease rule' in asbestos exposure cases permit[s] a plaintiff to commence separate causes of action for separate asbestos related diseases" and that this rule "was intended to remedy the inequities that arose in cases involving latent diseases that did not surface until years after the initial exposure"); *McNeil v. Owens-Corning Fiberglas Corp.,* 545 Pa. 209, 680 A.2d 1145, 1148 (Pa.1996) (same); *Simmons v. Pacor, Inc.,* 543 Pa. 664, 674 A.2d 232, 237 (Pa.1996) (same).

Plaintiffs' 1998 complaint alleged that, while working at DLA/DPSC, exposure to toxic substances caused Diaconu to develop health problems such as "hands and voice tremor, elevated function of the liver, CNS [central nervous system] disorder, respiratory and stomac[h] problems."Docket # 8 at ¶ 15. The complaint further alleged that Diaconu's symptoms had manifested as early as 1990. Diaconu now moves the court for permission to file a new tort suit on the grounds that she was diagnosed with cancer in March of 2006.

**\*5** Because Diaconu appears to be alleging a latent disease, it would appear that she should have the benefit of the "two disease rule" set out in *Marinari*

and subsequently affirmed by the Pennsylvania Supreme Court-especially because her situation cannot be readily distinguished from that of an asbestos plaintiff who, having filed an action shortly after the first symptoms of asbestosis, seeks to file an additional suit based on a "later, separately diagnosed, disease." Accordingly, I will grant Diaconu permission to file a new suit based on her claimed 2006 diagnosis of cancer.

### Conclusion

1. And now, upon consideration of plaintiff Eufrosina Diaconu's Motion for Reconsideration or in Alternate Motion for Permission to File a New Toxic Tort Claim, (Docket # 49), and the government's response thereto (Docket # 50), it is hereby ordered that:

(1) Diaconu's motion is **DENIED** insofar as it seeks reconsideration of the court's order of January 8, 2007 (Docket # 47).

(2) Diaconu's motion is **GRANTED** insofar as it seeks permission to file a new tort action on the basis of her cancer diagnosed in 2006.

2. On review of the Third Circuit's unpublished opinion, 33 Fed. Appx. 647 (3d Cir.2002), accompanying its judgment remanding the claim of Dorothy Butler for further proceedings (docketed by the Clerk of this Court on July 9, 2002, Docket # 40), this court's order of January 8, 2007 is **VACATED** to the extent that it denied Dorothy Butler's motion to reopen her part of this case (Docket # 42); and the Clerk of this Court is hereby directed to reopen Civil Action No. 98-6533 so that further proceedings may be had with respect to Dorothy Butler's claims.

E.D.Pa.,2007.
Diaconu v. Defense Logistics
Slip Copy, 2007 WL 966506 (E.D.Pa.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B

**Diaconu v. Gates, et al.**
**Civil Action No. 07-1358 (EGS)**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

EUFROSINA DIACONU          :      CIVIL ACTION
                                     :
        v.                       :
                                     :
DEPARTMENT OF DEFENSE        :      NO.  03-3405

## MEMORANDUM AND ORDER

Norma L. Shapiro, S.J.                           November 14, 2005

Plaintiff Eufrosina Diaconu ("Diaconu") is a former employee of the Defense Logistics Agency ("DLA") Defense Personnel Supply Center ("DPSC"), a division of the Department of Defense ("DOD").   On May 16, 2003, Diaconu, filing a pro se complaint in the Northern District of California, where she then resided, alleged violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., and requested a non-jury trial.[1]  The action was transferred to this court for improper venue.  Diaconu alleges that the DOD: (1)  failed to process her April 21, 1995 administrative complaint; (2) failed to process and forward to the United

---

[1] In her Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, Diaconu states that "[t]he instant case IS NOT a TITLE VII employment discrimination and retaliation case because effective 05/05/95 plaintiff was no longer a civilian federal government employee. . . THE INSTANT CASE IS ABOUT THE CIVIL RIGHTS ACT OF 1964 AND ITS 1991 AMENDMENT PROHIBITED ACTS OF DISCRIMINATION AND RETALIATION COMMITTED BY DLA/DPSC AGAINST PLAINTIFF AFTER SHE WAS NO LONGER ONE OF ITS CIVILIAN EMPLOYEES."  Pl.'s Opp'n at 2.  There is no other title of the Civil Rights Act that would cover discriminatory or retaliatory actions against former employees.  The court will consider Diaconu's claims under Title VII.

States Department of Labor her April 25, 1995 workers' compensation claim for injury;[2] (3)

failed to process Diaconu's May 3, 1995 retaliation complaint; and (4) failed correctly to

investigate her November 11, 1999 "Formal Retaliation Complaint," all because of her sex

(female), national origin (Romanian), and in retaliation for prior EEO activity.   Before the court

is the DOD Motion for Summary Judgment.   The court will grant the motion because there is no

genuine issue of material fact and the defendant is entitled to judgment as a matter of law.   An

appropriate Order follows.


**I. BACKGROUND**

Diaconu was employed as an environmental engineer by the DLA, in Alameda,

California, and then in Philadelphia, between 1985 and 1995.   Diaconu was terminated on May

5, 1995, for alleged insubordination, defiance of constituted authority, breach of safety, and rude

and discorteous conduct.   Ex. 1 to Pl.'s Mot. in Limine and Mot. in Opposition to Dismiss for

Improper Venue; Def.'s Ex. 2A and 2B.

Diaconu's documented difficulties with the DOD began before October 1991, when she

filed an EEO complaint alleging discrimination based on national origin and sex and retaliation

for filing a prior EEO complaint.   The complaint was investigated and dismissed; on appeal, the

EEOC affirmed the decision of the DOD's EEO office.   Diaconu v. Aspin, Appeal No.

01933584, 1994 EEOPUB LEXIS 2118 (EEOC Jan. 11, 1994) (Def.'s Ex. 1-A).

In June 1993, Diaconu filed another EEO complaint against DLA that alleged

---

[2] Diaconu's complaint states the date of her workers' compensation claim as 4/25/05, but
subsequent pleadings make it clear that this was a typographical error.   See, e.g., Plaintiff's Mot.
for Summ. J. at 8.

discriminatory failure to promote her to a certain position; the EEOC finally denied her appeal  in

1998.  See Diaconu v. Cohen, Appeal No. 01950488, 1998 EEOPUB LEXIS 1396 (EEOC March

12, 1998) (Def.'s Ex. 1-B).[3]

On April 21, 1995, Diaconu had written to George Allen, Deputy Commander of DPSC,

to protest the classification of her position.  Ex. 4 to Pl.'s Mot. for Summ. J.  Diaconu refers to

this letter as an "administrative complaint."  Allen responded on May 15, 1995 that he had been

informed her employment had been terminated, but the Office of Human Resources would

respond to her "in the very near future."  Pl.'s Ex. 3.  Diaconu heard nothing more about her

administrative complaint.

On April 25, 1995, Diaconu, through counsel, submitted a Workers' Compensation claim

---

[3] In the meantime, Diaconu had also filed two lawsuits alleging discrimination by the
DOD.  In Diaconu v. Defense Logistics, E.D. Pa., Civil Action No. 94-7273, Diaconu alleged
discrimination, harassment, threats of and reprisals, conspiracy, defamation, tortious and
wrongful suspension, negligent hiring, promotion and supervision, misrepresentation, deceit,
breach of implied covenants of good faith and fair dealing and intentional infliction of mental
and emotional distress by DLA.  In May 1995 the case was dismissed on the government's
unopposed motion to dismiss. An appeal was dismissed as untimely.  In January 1996, Diaconu
filed Diaconu v. Perry, E.D. Pa., Civil Action No. 96-0214, alleging that DLA-DSCP
discriminated against her on the basis of her national origin, gender, and age and retaliated
against her for activity protected by Title VII and the Whistleblower Protection Act by various
employment actions during the 1993-95 period, including her removal.  The court in that case
granted the government's motion for summary judgment on the claims of national origin
discrimination, age discrimination, retaliation for activity protected by Title VII, intentional
interference with advantageous contractual relations and the Whistleblower Protection Act claim.
Diaconu v. Perry, 1996 WL 665504 (E.D. Pa. Nov. 8, 1996).   A jury subsequently rendered a
verdict against Diaconu on her claim of sex discrimination.  An unrelated third lawsuit alleging
negligence and Bivens claims arising from alleged environmental exposure to hazardous
substances was filed in 1998 by Diaconu and a co-plaintiff.  The claims were dismissed as barred
by the statute of limitations.  See Diaconu v. Defense Logistics Agency, 1999 WL 238954 (E.D.
Pa. Apr. 2, 1999) (Def.'s Ex. 8A).  Diaconu's subsequent motion for reconsideration was denied.
Order of May 3, 1999 in Diaconu v. Defense Logistics Agency, E.D. Pa., Civil Action 98-6533
(Def.'s Ex. 8B.).

for acute psychological and emotional stress and anxiety disorder from her employment.  Pl.'s Ex. 2.  She requested DLA to obtain her supervisor's signature, as she had not personally submitted the form for his signature.  Id.  On July 14, 1996, she wrote her former supervisor to ask him to complete the Supervisor's Report because she had been told that the form could not be forwarded to the Department of Labor without it.  Pl.'s Ex. 6.[4]  Nothing happened.

On May 3, 1995, after she was notified of her termination, Diaconu wrote the EEO counselor at DPSC to complain that her termination was unjustified, although she did not specify violations of any civil rights laws.  Pl.'s Ex. 1.[5]  Diaconu claims there was no response.[6]

On April 24, 1998, Diaconu wrote to the EEOC requesting action on her June 1993 complaint.  Pl.'s Ex. 10.  The EEOC treated the letter as a request for reconsideration (a choice she protested, see Pl.'s Ex. 9), and reaffirmed in October 1999.  Diaconu v. Cohen, Appeal No. 01950488, 1999 EEOPUB LEXIS 6005 (EEOC Oct. 22, 1999) (Def.'s Ex. 1-C).

The EEOC found that Diaconu's arguments for reconsideration related to new matters not previously raised, which required filing a new complaint.  Def's Ex. 1-C.[7]  On November 11,

---

[4] The DOD avers that it has no record of such a claim being filed.  Def.'s Ex. 16, 17.

[5] The DOD avers that it has no record of this complaint.  Def.'s Ex. 15.

[6] Diaconu separately appealed her termination to the Merit Systems Protection Board ("MSPB") in May 1995; her appeal was denied.  Def's Ex. 3.  In December 1995, the Board granted Diaconu a waiver of the time limit for filing a petition for review; it also notified Diaconu of her right to request EEOC review of her discrimination claims, to file a civil action, or alternatively to appeal the Board's decision to the Federal Circuit.  Diaconu v. Dep't of Defense, 1995 MSPB Lexis 1914 (Dec. 13, 1995).

[7] In a footnote, the EEOC advised the agency that if Diaconu requested EEO counseling within 15 days of the date she received the decision, her initial EEO contact would be referred back to the date of the "appeal statement in which she raised" the new allegations.  Def.'s Ex. 1-C.  In this case, the "appeal statement" is Diaconu's letter of April 24, 1998.  The April 1998

4

1999, Diaconu filed a complaint of discrimination and retaliation with the EEO office at DLA.[8]

Pl.'s Ex. 11 (cover letter); Def's Ex. 14.  It alleged discrimination on the basis of race, color, sex

and national origin as well as retaliation for prior EEO activity.  It asserted for the first time that

DLA failed to process Diaconu's 4/21/1995 letter protesting the classification of her position and

her workers' compensation claim of 4/25/1995.  All the allegations in this complaint related to

adverse actions Diaconu had suffered before May, 1995; the DLA EEO Office dismissed the

complaint as untimely on May 25, 2001.  Def.'s Ex. 10 at 3.[9]  Diaconu appealed the dismissal

by letter dated July 1, 2001.  Def's Ex. 11.  The EEOC affirmed the dismissal on January 29,

2002.  Def.'s Ex. 1-D.  Diaconu then submitted comments to the EEOC on March 26, 2002.

The EEOC considered the comments a request for reconsideration and denied it on October 3,

2002, but notified  Diaconu of her right to file suit in federal court within 90 days of receiving

the denial.  Def.'s Ex. 1-E.  Diaconu timely filed this action.


## II. DISCUSSION

DLA moves for summary judgment for lack of subject matter jurisdiction, timeliness,

failure to state a claim,  res judicata, and collateral estoppel.

---

letter does not raise any of the allegations in this action and cannot count as the initial EEO
contact for any of them.

[8] The parties disagree on whether this filing qualified as a "formal" complaint; their
disagreement  is immaterial for purposes of this motion.

[9]  The claims related to the processing of her EEO complaint were also dismissed
pursuant to 29 C.F.R.  § 1614/107(a)(8), providing that agencies shall dismiss a complaint "that
alleges dissatisfaction with the processing of a previously filed complaint."  29 C.F.R. §
1614.107(a)(8).

5

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Only a factual dispute that might affect the outcome under governing law precludes the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). When reviewing a motion for summary judgment, a court must evaluate the facts in a light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. Id. at 255. The mere existence of a scintilla of evidence in support of the nonmovant's position will be insufficient; there must be evidence on which the jury could reasonably find for the nonmovant. Anderson, 477 U.S. at 252.

**a. Subject matter jurisdiction**

The DOD argues that Diaconu's failure to exhaust administrative remedies deprives the court of subject matter jurisdiction. Failure to exhaust administrative remedies does not deprive the district court of subject matter jurisdiction, but is treated as a failure to state a cause of action. Robinson v. Dalton, 107 F.3d 1018, 1022 (3d Cir. 1997).

**b. The alleged discriminatory actions taken in 1995**

Under Title VII, a plaintiff must exhaust available administrative remedies before filing suit in federal court. Robinson, 107 F.3d at 1020. Timely exhaustion of remedies "requires both consultation with an agency counselor and filing a formal EEOC complaint within the required times." Robinson, 107 F.3d at 1021. Under current EEO regulations, a plaintiff must initiate contact with an EEO counselor within 45 days of the alleged discriminatory conduct. See 29 C.F.R. § 1614.105. The 45-day period should be extended only where the aggrieved person was not aware of the time limitations or prevented from timely contact despite due diligence. 29

6

C.F.R. § 1614.105(a)(2);  Johnson v. Gober, 83 Fed. Appx. 455, 460-61 (3d Cir. 2003).

There is no genuine issue of material fact regarding timeliness.  The alleged

discriminatory actions are DLA's failure to process an April 21, 1995 administrative complaint,

an April 25, 1995 workers' compensation claim, and a May 3, 1995 reprisal complaint.  They

occurred over three years before Diaconu's EEO complaint of November 1999.  See Def.'s Ex.

14.  Diaconu argues that she made the prescribed initial EEO contact on July 14, 1996, by

copying the DLA EEO Office on a letter she sent her supervisor, John Bravo.  The letter

complained that he had not yet signed her workers' compensation claim and threatened him with

legal action, but did not attempt to articulate reasons for the alleged discrimination.[10]  The letter

was not an initial EEO contact.  See, e.g., Burton v. Batista, 339 F. Supp. 2d 97, 112 (D.D.C.

2004) (memorandum copied to EEO Office did not qualify as initial contact).  Diaconu admitted

in her November 1999 EEO complaint that "[t]his issue was never before brought to the EEO

DLA-DPSC's attention because [Diaconu] was still waiting for the agency to process her claim."

Def.'s Ex. 14.  Diaconu clearly did not contact the EEO within 45 days of the alleged

discriminatory conduct.

There is no reason to extend the 45-day period.  Diaconu had availed herself of the EEO

process in the past and was familiar with it.  Diaconu alleges that the DPSC EEO office, by its

inaction, "sabotaged [her] opportunity to file the formal complaint sooner than she did," but the

date of her formal complaint is not the issue.  Diaconu has produced no evidence she was

---

[10] The letter reads in relevant part: "unless you want me to keep filing suits against you and DPSC, please complete the Form CA-2.  Beware, refusing to process the subject claim could also be ground for a new EEO complaint against you and DPSC.  Do you really want that?"  Pl.'s Ex. 6.

prevented from requesting EEO intervention in any form.    See Anderson, 477 U.S. at 256 (the

party moving for summary judgment has the burden of showing the absence of a genuine issue of

fact, but the plaintiff is not relieved of his burden of producing in turn evidence supporting a

decision in his favor).

Diaconu's claims regarding alleged agency misconduct in 1995 must be dismissed

because Diaconu did not contact an EEO counselor about them within the 45-day period

prescribed by the statute.[11]

**c. The DLA's alleged failure to investigate Diaconu's EEO complaint in 1999**

If an EEO claimant alleging discrimination under Title VII  is dissatisfied with the

disposition of her claim, her remedy is to seek de novo review of that decision in federal court.

See 42 U.S.C. § 2000e-16.   The EEOC regulations reflect this: agencies must dismiss a

complaint "that alleges dissatisfaction with the processing of a previously filed complaint."  29

C.F.R. § 1614.107(a)(8).  De novo review of the plaintiff's discrimination claims in federal court

is an adequate remedy for any deficient treatment of her discrimination claim.  Adams v. U.S.

E.E.O.C., 932 F. Supp. 660, 663 (E.D. Pa. 1996).  Only  "[a]gency action made reviewable by

statute and final agency action for which there is no other adequate remedy in a court are subject

to judicial review" under the Administrative Procedure Act. 5 U.S.C. § 704.  Because de novo

review of the merits is an adequate remedy for any deficiency in an agency's disposition of a

discrimination or retaliation claim, the manner in which the agency handled Diaconu's EEO

complaint is not independently reviewable in federal court.    Diaconu's allegation that DLA did

---

[11]  Because these claims are dismissed on timeliness grounds, there is no need to discuss
their merits.

not investigate Diaconu's "Formal Retaliation Complaint filed on 11/11/99" fails to state a claim.

## IV. CONCLUSION

The court has jurisdiction over the subject matter but will grant summary judgment because Diaconu failed to exhaust her administrative remedies timely with respect to the three alleged discriminatory actions that occurred in 1995 (DLA's failure to process the 5/3/95 complaint of reprisal; the 4/25/95 workers' compensation claim; and the 4/21/95 administrative complaint). As <u>de novo</u> review of Diaconu's 1999 retaliation complaint is an adequate remedy for any deficiency in the DLA's investigation of it, there is no independent judicial review of DLA's alleged improper processing of the 1999 complaint.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **EUFROSINA DIACONU** | : | **CIVIL ACTION** |
| | : | |
| | : | |
| **v.** | : | |
| | : | |
| **DEPARTMENT OF DEFENSE** | : | **NO.  03-3405** |

## JUDGMENT ORDER

AND NOW, this 14th day of November, 2005, it is **ORDERED** that:

1.  The Motion for Summary Judgment of Defendant Secretary of the Department of Defense (Paper #52) is **GRANTED**.

2. Judgment is entered in favor of the Department of Defense against Eufrosina Diaconu.

         /s/ Norma L. Shapiro
                                                  S.J.

# EXHIBIT C

**Diaconu v. Gates, et al.**
**Civil Action No. 07-1358 (EGS)**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 99-1454

DIACONU EUFROSINA;
BUTLER S. DOROTHY, ON BEHALF OF THEMSELVES
AND ALL OTHERS AS DEFINED BELOW

v.

DEFENSE LOGISTICS AGENCY;
DEFENSE SUPPLY CENTER PHILADELPHIA;
DAVID COHEN, THE HONORABLE,
SECRETARY OF DEFENSE;
JOHN BRAVO, INDIVIDUALLY AND
IN HIS CAPACITY AS DIRECTOR,
OFFICE OF HEALTH SAFETY & ENVIRONMENT;
ENVIRONMENTAL PROTECTION AGENCY;
CAROL M. BROWNER, THE HONORABLE,
ADMINISTRATOR

Diaconu Eufrosina;
Butler S. Dorothy,
Appellants

On Appeal From the United States District Court
For the Eastern District of Pennsylvania
(D.C. Civ. No. 98-cv-06533)
District Judge: Honorable Charles R. Weiner

Submitted Under Third Circuit LAR 34.1(a)
April 2, 2002

Before:     SCIRICA, BARRY and COWEN, Circuit Judges.

# JUGMENT

This cause came on to be heard on the record from the United States District Court for the Eastern District of Pennsylvania and was submitted pursuant to Third Circuit LAR 34.1(a). On consideration whereof, it is now here

ORDERED AND ADJUDGED by this court that the judgment of the District Court entered April 2, 1999 be and the same is hereby affirmed in part and reversed and remanded in part. All of the above in accordance with the opinion of this Court.

ATTEST:

*Marcia M. Waldron*

Clerk

DATED: April 16, 2002

**UNREPORTED- NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 99-1454

---

DIACONU EUFROSINA;
BUTLER S. DOROTHY, ON BEHALF OF THEMSELVES
AND ALL OTHERS AS DEFINED BELOW

v.

DEFENSE LOGISTICS AGENCY;
DEFENSE SUPPLY CENTER PHILADELPHIA;
DAVID COHEN, THE HONORABLE,
SECRETARY OF DEFENSE;
JOHN BRAVO, INDIVIDUALLY AND
IN HIS CAPACITY AS DIRECTOR,
OFFICE OF HEALTH SAFETY & ENVIRONMENT;
ENVIRONMENTAL PROTECTION AGENCY;
CAROL M. BROWNER, THE HONORABLE,
ADMINISTRATOR

Diaconu Eufrosina;
Butler S. Dorothy,
Appellants

---

On Appeal From the United States District Court
For the Eastern District of Pennsylvania
(D.C. Civ. No. 98-cv-06533)
District Judge: Honorable Charles R. Weiner

---

Submitted Under Third Circuit LAR 34.1(a)
April 2, 2002

Before:     SCIRICA, BARRY and COWEN, <u>Circuit Judges</u>.

(Filed: April 16, 2002)

---

OPINION

---

PER CURIAM

Diaconu Eufrosina[1] and Butler S. Dorothy appeal from the District Court order

dismissing their complaint as time-barred. Their complaint contained causes of action

sounding in tort and strict liability, and also a <u>Bivens</u> claim against one of Diaconu's

supervisors, all arising from their exposure to chemicals when they worked at a Defense

Logistics Agency site (referred to here as "DLA/DSPC"--in Diaconu's case from 1990 to

1995, and in Butler's case, from 1970 to 1993.

Before we can reach the merits of the appeal, we must address a jurisdictional

issue. A notice of appeal in a civil case in which the United States is a party must be filed

within 60 days of the date of entry of the judgment or order appealed. Fed. R. App. P.

4(a). The order appealed was entered on April 2, 1999. If a motion for reconsideration of

a District Court order is timely filed, the time for appeal does not begin to run until the

District Court enters an order disposing of the motion. Fed. R. App. P. 4(a)(4). The time

for appeal was not tolled in this instance, however, because the motion for

reconsideration was filed more than ten days after the entry of the District Court's order.

---

[1] Although the caption lists the appellant's name as Diaconu Eufrosina, we believe her
last name is Diaconu, and will refer to her as such throughout this opinion.

See Fed. R. Civ. P. 59(e). To be timely, therefore, the notice of appeal must have been

filed on or before June 1, 1999. The docket shows that the notice of appeal was filed on

June 3, 1999.

However, in the jurisdictional response, Diaconu asserts under penalty of perjury

that she hand-delivered the notice of appeal to the clerk's office of the United States

District Court for the Eastern District of Pennsylvania on June 1, 1999. The document is

marked "1 June 1999," and is also marked "HAND DELIVERED." Thus, it appears that

the appeal was timely filed, and that perhaps a clerical error caused the notice to be

entered at a later date. We will now consider the merits.

The District Court correctly noted that in Pennsylvania, there is a two year statute

of limitations for tort actions. See 42 Pa. Cons. Stat. Ann. § 5524. This Court has

recognized that under Pennsylvania law, "three independent phases of knowledge must be

known or knowable to plaintiff before the limitations period commences: (1) knowledge

of the injury; (2) knowledge of the operative cause of the injury; and (3) knowledge of the

causative relationship between the injury and the operative conduct." O'Brien v. Eli Lilly

Co., 668 F.2d 704, 709 (3d Cir. 1981). Although a plaintiff is expected to use all

reasonable diligence in learning the facts that form the basis of her claim, the discovery

rule may toll the statute of limitations in cases in which the plaintiff cannot reasonably be

expected to be aware of the injury or of its cause. Romah v. Hygienic Sanitation Co., 705

3

A.2d 841, 857 (Pa. Super. 1997).[2]

Addressing Diaconu's claims first, the complaint states that in 1991, samples collected from the basement of one of the DLA/DSPC buildings contained 300,000 ppm of DDT, and that in 1992 she "discovered that the blankets, tents and all the clothings that were still being manufactured in the Factory . . . contained also over 1,000 ppm DDT, PCP, lindane and so on." The complaint states that at the time Diaconu was "[a]larmed by these findings, witnessing women fainting or vomiting in the basement of B-9, and very much concerned about her own health." In 1993, based on her concerns, she served DLA/DSPC and others with a "60 Days Notice of Intent to File a Citizen Suit." Diaconu states that she was rushed to the emergency room three times during her employment at DLA/DSPC, and also filed three workers' compensation claims while working there. On January 3, 1997, the Social Security Administration found Diaconu disabled retroactive to December 15, 1995.

All of the allegations in the complaint concern events that took place from 1990 to 1995. The complaint was filed on December 16, 1998. In her brief, Diaconu claims that the statute of limitations was tolled due to fraud and concealment on the part of defendants. However, it is clear from the allegations of the complaint that Diaconu was aware of exposure to chemicals at the time she was employed by DLA/DSPC, and that

---

[2] A Bivens action is likewise subject to the two-year limitation period. Knoll v. Springfield Township Sch. Dist., 763 F.2d 584, 585 (3d Cir. 1985) (applying Pennsylvania's then current six-year statute of limitations).

4

she had concerns for her declining health at the time. The fact that the Social Security
Administration found her disabled retroactive to December 1995 indicates that her
symptoms manifested at least as early as that date. Thus, her claims are time-barred.

Butler alleged in the complaint that she developed a skin condition due to exposure
to chemicals on fabrics she worked with. She was aware of this link in 1992 and 1993,
and filed an unsuccessful workers' compensation claim. This claim is thus time-barred.
Butler also alleges in the complaint that "as a result of the cumulative exposure to various
cocktails of chlorinated hydrocarbons type of pesticides and exposure to vapors of
benzene, PCB, asbestos, unknown odors, fugitive dust, lead, H-pyllory bacteria,
clorophorm [sic] and so on; e.g. plaintiff Butler S. has just had a cancer operation."
Complaint ¶ 33, c. In her motion for reconsideration before the District Court, Butler
stated that her endometrial cancer was diagnosed in early 1998. Although Butler alleges
that she was aware of some chemical exposure while working at DPSC, she could not
have been aware of the specific injury; i.e., the cancer, until it was diagnosed in 1998.
Thus, it appears that under Pennsylvania law, this claim is not time-barred, and we will
remand to allow the District Court to consider the claim in the first instance. We express
no opinion as to whether Butler will be able to establish the requisite causation.

Diaconu has filed two motions: one, a "Motion for Summary Judgment, Liability
Award Decision and Motion in Limine," which we will construe as a motion for summary
reversal; the other, "Appellant's Application for Relief for Specific Performance and

Specific Damages," which Butler seeks to join.[3]  In each motion, Diaconu seeks to introduce new evidence in support of her claims.[4] As a general rule, a federal appellate court does not consider an issue not passed upon in the district court.  Singleton v. Wulff, 428 U.S. 106, 120 (1976); Ross v. Hotel Employees and Restaurant Employees International Union, 266 F.3d 236, 242 (3d Cir. 2001).  Thus, the motions are denied.

For the foregoing reasons, we will affirm the judgment entered on April 2, 1999, dismissing the claim of Diaconu Eufrosina, but will vacate the judgment insofar as it concerns Butler S. Dorothy, and remand for further proceedings consistent with this opinion.

---

[3] We grant Butler's motion, to the extent she seeks to join in Diaconu's motions; however, as noted, we are denying the motions on the merits.

[4] Although it is not clear from the submission; it appears that Diaconu may have developed symptoms and/or diseases that she was not aware of at the time the complaint was filed.  We express no opinion as to whether a new complaint containing claims based on those symptoms would be barred under the discovery rule.  See Ziebert v. Bogert, 773 A.2d 758, 761 (Pa. 2001) (noting that Pennsylvania recognizes the "separate disease" rule for statute of limitations purposes in certain cases.

# EXHIBIT D

**<u>Diaconu v. Gates, et al.</u>**
**Civil Action No. 07-1358 (EGS)**

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| EUFROSINA DIACONU ET AL., | CIVIL ACTION |
| PLAINTIFFS, |  |
| v. | No. 98-6533 |
| DEFENSE LOGISTICS ET AL., |  |
| DEFENDANTS |  |

## MEMORANDUM/ORDER

March 29, 2007

Currently before the court are plaintiff Eufrosina Diaconu's Motion for Change in Venue (Docket # 51), Second Motion for Change in Venue (Docket # 53), and Third Motion for Change in Venue (Docket # 55).  In all three motions, Diaconu moves this court to "reopen the instant case limited to change in venue," from the United States District Court for the Eastern District of Pennsylvania to the United States District Court for the District of Columbia. *See* Docket # 51 at 1; Docket # 53 at 1; Docket # 53 at 1.

On March 27, 2007, I issued a memorandum and order (1) concluding that Pennsylvania law authorized Diaconu to file a new tort action against defendants on the basis of the cancer that she was allegedly diagnosed with in 2006, and (2) granting Diaconu permission to file such an action.  In light of that decision, it is **ORDERED** that

1

Diaconu's Motion for Change in Venue (Docket # 51), Second Motion for Change in

Venue (Docket # 53), and Third Motion for Change in Venue (Docket # 55) are hereby

**DISMISSED** as **MOOT**.


BY THE COURT:


/s/ Louis H. Pollak
Pollak, J.

# EXHIBIT E

**<u>Diaconu v. Gates, et al.</u>**
**Civil Action No. 07-1358 (EGS)**

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

EUFROSINA DIACONU ET AL.,

             PLAINTIFFS,

          v.

DEFENSE LOGISTICS ET AL.,

             DEFENDANTS

CIVIL ACTION

No. 98-6533

## MEMORANDUM/ORDER

April 16, 2007

     Currently before the court is plaintiff Eufrosina Diaconu's Fourth Motion for Change in Venue. Docket # 58.  This motion, like Diaconu's three previous motions for change in venue, seeks the transfer of *Diaconu v. Defense Logistics*, No. 98-cv-6533, from United States District Court for the Eastern District of Pennsylvania to the United States District Court for the District of Columbia. Docket # 51, 53, 55 (previous motions for change in venue).

     In an order filed on March 27, 2007 (Docket # 56), I determined that only plaintiff Dorothy Butler's claim is still before this court, Diaconu's claims having being properly dismissed in a memorandum and order filed on January 8, 2007 (Docket # 47).  I further determined that Diaconu cannot reopen her part of Civil Action No. 98-6533 for purposes

1

of changing venue or otherwise. Docket # 56 at 6-7.  Finally, I concluded that

Pennsylvania law authorized Diaconu to file a new tort action against defendants on the

basis of the cancer that she was allegedly diagnosed with in 2006. *Id*. at 7-9.  I reiterated

these conclusions in an order filed on March 30, 2007, wherein I dismissed Diaconu's

first, second, and third motions for change in venue as moot. Docket # 57.

Diaconu would be best served to pursue her remedies through means other than the

filing of further motions for changes of venue.  This court can do nothing more for her

with regard to Civil Action No. 98-6533.  Accordingly, it is hereby **ORDERED** that

Diaconu's Fourth Motion for Change in Venue (Docket # 58) is **DISMISSED** as

**MOOT**.


BY THE COURT:


_____    /s/ Louis H. Pollak
Pollak, J.

2

# EXHIBIT F

**Diaconu v. Gates, et al.**
**Civil Action No. 07-1358 (EGS)**

**EUFROSINA DIACONU**
533 East Luray Street
Philadelphia, PA 19120

SUBJECT: **CLAIM FOR DAMAGE, INJURY OR DEATH** Standard Form 95
Dated May 14, 2007

U.S. DEPARTMENT OF DEFENSE
ATTN.: **WILLIAM J. HAYNES,**
        General Counsel
    Office Of General Counsel.
1600 Defense PENTAGON
Washington DC 20301                                May 14, 2007

BY OVERNIGHT EXPRESS MAIL EB 150012004 U.S.

Dear Mr. Haynes,

For your review and further action I am sending you the
referenced CLAIM FOR DAMAGE, INJURY OR DEATH with two (2)
exhibits.

I just received this form from the U.S. Attorney's Office
Philadelphia. In my NOTICE OF INTENT TO FILED A CLASS ACTION
TOXIC TORT against DoD and against EPA I informed you that I will
not entertain any dialog neither with DLA nor with anyone from
the U.S. Attorney's Office Philadelphia, and I meant it. Thanks
to the U.S. Supreme Court in WACHOVIA case, I no longer have to
put up with the E.D. Pa. & the U.S. Attorney's Office Philadelphia's
shenanigans !

I am forwarding the referenced claim directly to you expecting
that: **(i)** you directly review and rule on the claim; **(ii)** you
will forward your decision to the right authority to implement
your decision; **(iii)** you personally will see that the enclosed
claim for damage and injury is brought to a satisfactory conclusion
on or before **June 30, 2007.**
If you consider that in good faith you need additional
informations, let me know; I'll do my best to cooperate with you.

Should you not agree with the enclosed claim for damage and
injury, please, let me know immediately: before June 12, 2007. As
you recall, in my NOTICE OF INTENT the dead-line is June 12,
2007. I assure you that during the period of June 12 to June 30,
2007 I WILL file the new and improved class action toxic tort, no
questions about it.

For your perusal I am also sending you a copy of the letter I

just mailed to Mr. PATRICK L. MEEHAN, U.S. Attorney's Office and a letter I mailed it to the Hon. LOUIS POLLAK, E.D. Pa. who handles BUTLER's portion of the first class action toxic tort case that it was remanded by the 3rd. Circuit. I hope you take the time and read these letters because are few things you should to know about it; they will come up during the life of the new complaint I am about to file. THANK YOU !

Sincerely,

3 Encls.                    EUFROSINA DIACONU

| CLAIM FOR DAMAGE, INJURY, OR DEATH | INSTRUCTIONS: Please read carefully the instructions on the reverse side and supply information requested on both sides of the form. Use additional sheet(s) if necessary. See reverse side for additional instructions. | FORM APPROVED OMB NO. 1105-0008 |
|---|---|---|

| 1. Submit To Appropriate Federal Agency: | 2. Name, Address of claimant and claimant's personal representative, if any. (See instructions on reverse.) (Number, street, city, State and Zip Code) |
|---|---|
| 1600 Defense PENTAGON, Washington<br>U.S. DEPARTMENT OF DEFENSE<br>Attn.: **WILLIAMS J. HAYNES,**<br>       GENERAL COUNSEL.<br>OFFICE OF GENERAL COUNSEL | **EUFROSINA DIACONU**<br>533 East Luray Street<br>Philadelphia, PA 19120 |

| 3. TYPE OF EMPLOYMENT | 4. DATE OF BIRTH | 5. MARITAL STATUS | 6. DATE AND DAY OF ACCIDENT | 7. TIME (A.M. or P.M.) |
|---|---|---|---|---|
| ☐ MILITARY ☒ CIVILIAN | 11/10/1941 | Single | N/A | N/A |

8. Basis of Claim (State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurrence and the cause thereof) (Use additional pages if necessary.)

1990-1995 exposed to ultrahazardous chemicals and materials that caused irreversible damages to my CNS and other health injuries including but not limited to cancers diagnosed in 2006 and to my irreversible total and permanent disability since February 1995. The 04/25/95 workers compensation claim for injury filed on my behalf by Anthony J. McKNIGHT was never processed by DLA/DPSC, and my verbal request to be placed in disability status was denied and insteed my employment was terminated. For more details see attached **EXPLANATION** with *12* EXHIBITS.

| 9. PROPERTY DAMAGE |
|---|

NAME AND ADDRESS OF OWNER, IF OTHER THAN CLAIMANT (Number, street, city, State, and Zip Code)

N/A

BRIEFLY DESCRIBE THE PROPERTY, NATURE AND EXTENT OF DAMAGE AND THE LOCATION WHERE PROPERTY MAY BE INSPECTED. (See instructions on reverse side.)

Defense Personnel Support Center ("DPSC") it was closed by BRAC 1993 and by BRAC 1995. No longer exists.

| 10. PERSONAL INJURY/WRONGFUL DEATH |
|---|

STATE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM. IF OTHER THAN CLAIMANT, STATE NAME OF INJURED PERSON OR DECEDENT.

See Attached **EXPLANATION** with *two (2)* EXHIBITS, which includes but is not limited to doctor's evaluation concerning the nexus between my disability and other health injuries to my exposure to ultrahazardous ~~chemicals and materials~~

| 11. WITNESSES | |
|---|---|
| NAME | ADDRESS (Number, street, city, State, and Zip Code) |
| See attached **WITNESSES** detailed informations. | |

| 12. (See instructions on reverse) | AMOUNT OF CLAIM (In dollars) | | |
|---|---|---|---|
| 12a. PROPERTY DAMAGE | 12b. PERSONAL INJURY | 12c. WRONGFUL DEATH | 12d. TOTAL (Failure to specify may cause forfeiture of your rights.) |
| 1,000,000. | 15,000,000. | N/A | 16,000,000. |

I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE ACCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM.

| 13a. SIGNATURE OF CLAIMANT (See instructions on reverse side.) | 13b. Phone number of signatory | 14. DATE OF CLAIM |
|---|---|---|
| *[signature]* | 215-329-9532 | 5-14-07 |

| CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM | CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS |
|---|---|
| The claimant shall forfeit and pay to the United States the sum of $2,000 plus double the amount of damages sustained by the United States. (See 31 U.S.C. 3729.) | Fine of not more than $10,000 or imprisonment for not more than 5 years or both. (See 18 U.S.C. 287, 1001.) |

*1 of 3*

**CLAIM FOR DAMAGE, INJURY, OR DEATH** dtd. May, 14,2007

Para. 8- Bases of Claim:    E X P L A N A T I O N

The instant CLAIM FOR DAMAGE AND INJURY **DOES NOT** address the cancer I was diagnosed with in May 2006. The cancer issue will become the subject of a new and improved class action toxic tort complaint to be filed in the U.S. District Court for The District Of Columbia. On March 2007 the Hon. LOIS H. POLLAK, U.S. District Court For The Eastern District Of Pennsylvania has approved the new class action toxic tort to be filed in the District Of Columbia.

The instant CLAIM FOR DAMAGE AND INJURY **ADDRESSES ONLY** the issues subject to the following complaints filed pro se and in forma pauperis: DIACONU v. DLA No. 03-3405 (E.D. Pa.); DIACONU & BUTLER v. DLA/DPSC, CLASS ACTION TOXIC TORT No. 98-06533 (E.D. Pa.); DIACONU v. DLA/DPSC No. 95-0214 (E.D. Pa.) and DIACONU v. DLA/DPSC No. 94-7273 (E.D. Pa.) all of which at the specific request made by the U.S. Attorney's Office Philadelphia, with impunity, ignoring the facts and the direct evidences, the E.D. Pa. dismissed these cases. Not only that the cases were assigned to judges that were very old but, they were so mentally, emotionally and physically deteriorated that were NOT capable to make a rational judicial judgement. Case in point is the late Hon. C. Weiner, presiding judge on DIACONU & BUTLER v. DLA/DPSC CLASS ACTION TOXIC TORT case No. 98-6533 (E.D. Pa.). On appeal the U.S. Court For Appeals For The 3rd. Circuit tried to settle the case with DIACONU & BUTLER but the U.S. Attorney's Office Philadelphia refused to settle.

The decisions issued by the E.D. Pa. on the cases cited above should NOT be weighted in when deciding the instant CLAIM FOR DAMAGE AND INJURY, because of the condense report EXHIBIT # 1 -PHILADELPHIA, PENNSYLVANIA SUCCESSFULLY CREATES ITS OWN 2nd. CLASS CITIZENS.

In support to the instant CLAIM FOR DAMAGE AND INJURY, at this time I provide the following documents. Upon request I can provide more documents.

**1.** EXHIBIT # 2 - MEDICAL REPORT dtd. 05/15/01 prepared by MARTIN PIERETTI, DO., MPH, CIME, Medical Director-WorkHealth, Board Certified Occupational & Environmental Medicine with Frankford Hospitals, Philadelphia, PA. This report clearly establishes the nexus between my exposure to the ultrahazardous chemicals and materials and my total and irreversible neurological condition the result of which the U.S. Social Security Administration on January 1997 found me, retroactive to December 1995, to be totally and permanently disabled. This report also established that other health injuries discovered in 1999 and 2000 were all

traced to my exposure to the ultra-hazardous chemicals and materials I was exposed to while working for DLA/DPSC in Philadelphia, PA. Once located at 2800 So. 20th. Street in south Philadelphia, this civilian facility NO LONGER EXISTS; it was closed by BRAC 1993 and by BRAC 1995.

In deciding the instant claim for damage and injury the following should be factored in: **(1)** in absolutely every written/published or court's documents, DLA/DPSC was presented as a civilian agency supporting DoD's military personnel with food, clothing and medical assistance. Nothing hazardous about it, right ? Wrong ! **(2)** Although all military personnel detached to DPSC, the civilian manegement and DPSC's Office Of Counsel absolutely all knew about it, as part of the Manufacturing Department of DLA/DPSC in Philadelphia there was an illegal chemical plant. This illegal chemical plant (i) it was never made public; (ii) it was never part of my PD as an ENVIRONMENTAL ENGINEER GS 819-11 Step 7 and (iii) it was never part of the PD of the low grade employees working in the Factory. **(3)** Time and again, despite numerous complaints from the employees, despite employees dropping death on the job or soon after they become ill, although they had direct knowledge about it, the Office of Human Resources and the Office Of Counsel never informed the U.S. Department of Labor about the true working conditions at DPSC, the result of which our workers compensation claim for injury were dismissed or not forwarded to the Labor Department. Case in point is the workers compensation claim filed on my behalf by Mr. Anthony J. McKnight, Esq. Philadelphia who was never processed, instead two days after the claim was filed with DPSC I was fired. The process to fire me begone while I was in two months sick live. **(4)** The U.S. District Court For The Eastern District Of Pennsylvania in concert with the U.S. Attorney's Office Philadelphia helped DPSC to keep the true condition of the base from becoming public - see EXHIBIT # 1.

It was the Commonwealth of Pennsylvania Department Of Environmental Protection ("PA DEP") and the Pennsylvania Housing Authority ("PHA") who finally forced and succeed DLA/DPSC to admit that the facility once located at 2800 South 20th. Street, Philadelphia was a cesspool of highly hazardous chemicals and materials the result of which (i) all but two buildings have been demolished; (ii) DLA paid the City of Philadelphia and to PHA over 100 million dollars in compensation for contaminating their buildings and polluting their waters, air and soil. YET, when the U.S. Court of Appeals For The 3rd. Circuit tried to settle our class action toxic tort claim; when myself, Butler and the members of the class wanted to settle the case, **IT WAS THE U.S. ATTORNEY'S OFFICE PHILADELPHIA AND THE E.D. PA. WHO REFUSED TO SETTLE WITH US.**

As stated at the beginning, the instant claim for damage and injury addresses only the issues subject to the four cases cited

on para. # 2 of **EXPLANATION.**

The required compensation amount reflects:

**$  1, 000,000.00 PROPERTY DAMAGE:**
a. irreversible intelectual damage;
b. the loss of job as an environmental engineer GS 0819-11 Step 7
   and earnings effective 05/05/95;
c. loss of <u>ANY</u> future job/work related earnings after 05/05/95 as
   since then I am totally and permanently disabled;
d. irreversible loss of personal health;
e. loss of pension and other financial benefits as a federal
   civilian employee;
f. loss of personal contribution toward a personal retirement
   plan;
g. breach of employment contract.

**$  15,000,000.00 FOR INJURY:**
a. slander;
b. injury to my personal and professional reputation;
c. retaliation and discrimination committed against me by
   DLA/DPSC;
d. E.D. Pa. & the U.S. Attorney's Office Philadelphia retaliation;
e. irreversible injury to my CNS;
f. my health  injuries as identified in <u>EXHIBIT # 2</u> it would have
   not occurred but for DLA/DPSC's (in concert with E.D. Pa. and
   the U.S. Attorney's Office Philadelphia) <u>tortious conduct</u>;
g. irreversible totally and permanently disabled since 1995: I
   no longer can cook, drink from a cup or glass, I hardly can
   walk with a cane, and so on;
h. pains and suffering;
i. continue delayed reaction to the hazardous chemicals and
   materials I was exposed;
j. many other reasons ....

EUFROSINA DIACONU

**CLAIM FOR DAMAGE, INJURY, OR DEATH** dtd. May 14, 2007

Para. 11                **W I T N E S S E S**

    The following individuals have direct knowledge about the
ENVIRONMENTAL HEARING BOARD's findings under EHB Docket No.
2000-004-MG that the soil, the groundwater, the indoor/outdoor
air and the buildings once occupied by the DLA/DPSC at 2800 So.
20th. Street, Philadelphia, PA. have been highly contaminated
with ultrahazardous chemicals that caused death and irreversible
health damages to its employees.

1. SCOTT J. SCHWARTZ, Esq.
    c/o MATTIONI Ltd.
   399 Market Str., 2nd.Floor
   Philadelphia, PA 19106

2. LOUISE THOMPSON, Esq.
   PA. Dept. Of Env. Protection
   Office of Chief Counsel
   Suite 6015, Lee Park
   555 North Lane
   Conshohocken, PA 19428

3. WM. STANLEY SNEATH, Esq.
   PA. Dept. Of Env. Protection
   Office of Chief Counsel
   Suite 6015, Lee Park
   555 North Lane
   Conshohocken, PA 19428

4. RODNEY H. FICKER, Esq.
   DLA-G
   8725 Kingman Rd., Suite 2533
   Ft. Belvoir, VA 22060-6221

5. ROBERT S. LINGO, Esq.
   Office of Comm. Counsel
   Army Material Command
   ATTN.: AMCCC-G
   5001 Eisenhower Ave.
   Alexandria, VA 22333-0001

6. MORMAN G. MATLOCK, Esq.
   Two Penn Ctr, Suite 200
   Philadelphia, PA 19102

7. RICHARD BELL,
    c/o DSCP
   700 Robbins Ave.
   Philadelphia,PA 19111-5092

8. WILLIAM S. STEM
    c/o DSCP
   700 Robbins Ave.
   Philadelphia,PA 19111-5092

A more comprehensive list may be provided upon request.

EUFROSINA DIACONU

## PHILADELPHIA, PENNSYLVANIA
### SUCCESSFULLY CREATES ITS OWN 2nd. CLASS CITIZENS

Even though the Civil Rights Act of 1991 and the Government Employee Rights Act of 1991 became into effect on 11/21/91 as Public Law 102-166, the U.S. Attorney's Office Philadelphia in concert with the U.S. District Court For the Eastern District Of Pennsylvania with impunity it has totally ignored this act, it has violated most of the Federal Rules For Civil Procedures and it has ignored the First, the Second and the Fifth Amendment of the U.S. Constitution. Complementing each other in their actions, starting with an antiquated PRO SE COMPLAINT FORMS, the U.S. District Court and the U.S. Attorney's Office it has successfully converted those seeking their rights into SECOND CLASS CITIZENS.

**1. THE U.S. ATTORNEY'S OFFICE PHILADELPHIA CONTRACTS OUT PRO SE CASES FILED AGAINST DoD'S COMPONENT ACTIVITIES IN ORDER TO MAKE IMPOSSIBLE FOR A PLAINTIFF PRO SE TO FIND REPRESENTATION.**
   o. DIACONU v. DLA case No. 03-3405 a pro se Civil Rights Act of 1991 discrimination case it was awarded to NADINE M. OVERTON, Esq. of Law Office Of Nadine Mariano Overton, Two Penn Center Plaza, Suite 1050, Philadelphia, PA 19102.
   o. DIACONU/BUTLER v. DLA CLASS ACTION TOXIC TORT No. 98-6533. A court appointed counsel for the limited scope to negotiate a settlement, it has successfully sided with the U.S. Attorney's Office and misrepresented Diaconu's interest in the case. This counsel's conduct it was rewarded by being promoted to and today it still is a judge in the Bankruptcy Court. Yet, during the same period and on the same ground as the case, the Commonwealth of Pennsylvania Environmental Protection Division has successfully filed a toxic tort case against DLA/DPSC, the result of which DLA/DPSC has paid about $ 100 million dollar in compensation for damages to its waters and to its soil. The U.S. Attorney's Office AND the U.S. District Court For The Eastern District Of Pennsylvania knew about it yet, refused to settle instead dismissed the class action pro case.

**2. THE U.S. DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA ROUTINELY DISMISSES PRO SE CASES FILED AGAINST DoD'S COMPONENTS:**
   o. BLUE v. DLA CLASS ACTION No. 04-2210, a pro se employment discrimination and retaliation case.
   o. GREEN v. ENGLAND No. 04-4049, a pro se employment retaliation and discrimination case.
   o. DIACONU v. DLA No. 03-3405, a pro se civil rights case.
   o. DIACONU/BUTLER v. DLA TOXIC TORT No. 98-6533 a pro se case.
   o. DIACONU v. DLA No. 96-0214 pro se employment termination.

**3. DIRECT/PRIMA FACIE EVIDENCE PROVIDED BY THE PLAINTIFFS PRO SE ARE ROUTINELY AND TOTALLY IGNORED IN ORDER TO ACCOMMODATE THE U.S. ATTORNEY'S OFFICE PHILADELPHIA REQUEST FOR DISMISSAL:**

EXHIBIT #1

a. BLUE v. DLA CLASS ACTION case No. 04-2210: (i) the 10/30/93 discrimination & retaliation investigation report prepared by the Lt.Col. Bodenhamer, DPSC Commanding Office, at the request of and for the Commander, it has established that at DLA/DPSC the acts of discrimination, retaliation, disparate working environment for the minorities, blacks, female and naturalized U.S. citizens have been the norms. Introduced into evidence by Mrs. Blue, it has been totally ignored. (ii) Statistical data obtained by the Federal Employee Task Force, NAACP from DLA/DPSC's Personnel Department and introduced into evidence showing beyound any doubt that the agency discriminated and retaliated against minorities, blacks & female it has been ignored. (iii) The EEOC's own recommendations has been ignored. (iv) The EEO Discrimination Report has been ignored. (v) The arguments and all the supporting documents have been ignored in order to justify the dismissal of the case.

o. DIACONU v. DLA, case No. 03-3405, a initially filed by Diaconu only as a violation of her 1991 civil rights, it was converted by the U.S. Attorney's Office and the U.S. District Court For The Eastern District Of Pennsylvania into a mix case, in order to accomodate the U.S. Attorney's Office speculations and the pleadings copy from the U.S. Attorney's Lawyer's Manual and to justify the dismissal of the case. Diaconu's arguments and her supporting direct evidences have been ignored.

o. DIACONU/BUTLER v. DLA, CLASS ACTION TOXIC TORT case No. 98-6533. As stated in the first paragraph, this case, in addition to the supporting environmental and medical overwhelming documents provided by Diaconu (an ex-environmental engineer), has been filed during the same period the Commonwealth of Pennsylvania Environmental Protection Division has filed the suit on the same ground against DLA/DPSC. Despite Diaconu's visible and irreversible total and permanent disability as well as the health conditions of other members of the class, the U.S. Attorney's Office asked the case to be dismissed and the presiding Judge obliged.

o. DIACONU v. DLA case No. 96-0214 an employment termination case it was dismissed on the ground that the employment relationship between Diaconu and her ex-employer, DLA/DPSC was such as the relationship between a servant and its master. She was an at-will employee who could be fired for any cause OR NO CAUSE at all, as long as the master no longer wanted to employ her, setting the entire issue 100+ years back. It should be noted that Diaconu it was NOT allowed to grieve her removal to the Commander DPSC nor to the DLA Commander or to the Secretary Of Defense.

**4. REQUESTS FOR COURT APPOINTED COUNSEL AT BEST ARE APPROVED AT FIRST ONLY TO BE DENIED AT A LATER DAY AND AT WORST ARE DENIED AS SOON AS THE REQUEST WAS MADE.**

o. BLUE v. DLA. Case No. 04-2210 CLASS ACTION. Mrs. Blue's request for a court appointed counsel it was approved as soon as it was made, only to be denied almost a year later in order to accomodate U.S. Attorney's Office request for dismissal made in its Cross Motion For Summary Judgement.

o. GREEN v. ENGLAND, case No. 04-4049 an employment retaliation and discrimination complaint. Mr. Green's (an accountant) request

for a court appointed counsel has been denied on the ground that being over 40 year old and a college graduate it will suffice to adequately represent himself. The three (3) pages 13 line items QUESTIONNAIRE ranged from the questions such as of what grades did he receive in schools to what often does he read books, newspapers, magazines and to provide their names; from the questions such as what television programs he is watching to whether he has "... any serious mental or physical illness or disability ? If so, please explain.".

o. DIACONU v. DLA case No. 03-3405, NOT A TITLE VII case but, a violation of plaintiff's civil rights. Despite Diaconu's known by the U.S. Attorney's Office and to the U.S. District Court For The Eastern District of Pennsylvania irreversible total and permanent disability, her request for court appointed counsel although initially approved it was denied at a later date in order to accomodate U.S. Attorney's Office request for dismissal.

o. DIACONU/BUTLER v. DLA case No. 98-6533 CLASS ACTION TOXIC TORT. Diaconu's and Butler's request for court appointed counsel has been denied from the beginning. Despite her visible irreversible total and permanent disability, Diaconu's request was denied on the ground that she gained experience in the legal field with her employment termination case, Diaconu v. DLA 96-0214.

o. DIACONU v. DLA case No. 96-0214. Despite Diaconu's irreversible total and permanent disability her request for court appointed counsel has been denied.

o. GREEN v. ENGLAND case No. 05-5411 an employment retaliation and discrimination complaint. Green's request for court appointed counsel has been denied on the same ground as in GREEN v. ENGLAND case No. 04-4049.

It should be noted that neither Blue nor Green, neither Diaconu nor Butler had any formal training in the legal field.

**5. PLAINTIFF'S EVIDENCE/SUPPORTING DOCUMENTS ARE NOT RECORDED ON THE CASE DOCKET, NOR ARE THOSE DOCUMENTS KEPT AS PART OF THE FILE'S RECORD.**

o. BLUE v. DLA CLASS ACTION case No. 04-2210. None of plaintiff's evidences/supporting documents have been recorded on the docket, nor are them part of the file.

o. DIACONU v. DLA case No. 03-3405; DIACONU v. DLA CLASS ACTION TOXIC TORT case No. 98-6533; DIACONU v. DLA case No. 96-0214. On all these cases Diaconu's evidence/supporting documents have NOT been recorded on the docket of each case, nor are those documents on the file's record. In fact this discovery prompted Diaconu on 02/03/06 to write a letter to the Hon. Harvey Bartle 3rd., Chief Judge for the U.S. District Court For The Eastern District Of Pennsylvania. The honorable judge is yet to respon to the letter.

**6. THE U.S. DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA ALLOWS THE U.S. ATTORNEY'S OFFICE PHILADELPHIA WITH IMPUNITY TO VIOLATE FEDERAL RULES FOR CIVIL PROCEDURES.**

o. BLUE v. DLA CLASS ACTION case No. 04-2210. The following violations took place:

    o. Actually, the U.S. Attorney's Office NEVER responded to

3

any of the plaintiff's motions, nor it addressed any of
the points of the complaint, yet the case it was dismissed.
- o. It tampered with the docket entries.
- o. Ex-parte communication with the presiding judge.
- o. Made pleadings on the name of a non-party on the case.
- o. Made derogatory motion about plaintiff.
- o. Relied on antiqueted cases, pleadings and statutes that
  have been preempted by the Government Employee Rights Act
  of 1991 and/or on cases that have not been tested yet.
- o. DIACONU v. DLA case No. 03-3405 a 1991 Civil Rights Act
  case, NOT a Title VII case:
    - o. Despite grants to numerouse requests for extended time
      the U.S. Attorney's Office NEVER responded on time.
    - o. NEVER responded to any of the plaintiff's motions, nor to
      the issues subject to the case.
    - o. It tampered with the docket entries.
    - o. Ex-parte communications with the presiding judge.
    - o. Introduced into evidence declarations from persons not
      familiar with the issues subject to the case.
    - o. Made derogatory motion about plaintiff.
    - o. Relied on antiqueted cases (1928 to 1978) and pleadings
      that were preempted by the Civil Rights Act of 1991
      or/and on cases that have not been yet tested.
    - o. Made motions that amounted to double jeopardy.
- o. GREEN v. ENGLAND, case No. 04-4049.
    - o. U.S. Attorney's Office relied on antiqueted cases and
      pleadings that have been preempted by the Government
      Employee Rights Act of 1991 and/or by cases that have not
      been tested yet.
- o. DIACONU v. DLA CLASS ACTION case No. 98-6533 TOXIC TORT
  CASE.
    - o. The U.S. Attorney's Office actually never responded to
      the issues subject to the complaint.
    - o. Never actually responded to the motions made by the
      plaintiffs.
    - o. Misinterpreted and misrepresented the environmental laws
      and health and safety laws.
- o. DIACONU v. DLA case No. 96-0214.
    - o. Most of the U.S. Attorney's Office motions were NOT made
      on time.
    - o. Eliminated the cited defendants DLA/DPSC managers with
      out prior approval from the U.S. Attorney General.
    - o. Relied on antiqueted cases, statutes and pleadings that
      heve been preempted by the Government Employee Rights Act
      of 1991 and/or on cases that have NOT been tested yet.

**7. U.S. DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA
KEEPS TWO KIND OF DOCKET: ONE FOR INTERNAL USE ONLY AND ONOTHER
ONE TO BE GIVEN TO THE PLAINTIFF PRO SE** WHICH SUBSTANTIALLY
DIFFERES FROM THE FIRST ONE.
- o. BLUE v. DLA CLASS ACTION case No. 04-2210
- o. DIACONU V. DLA No. 03-3405, DIACONU v. DLA 0214.

4

**8.  THE U.S. DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA & THE U.S. ATTORNEY'S OFFICE PHILADELPHIA <u>DOES NOT</u> ENFORCE THE SETTLEMENT AGREEMENTS WITH PLAINTIFFS FILED CASES AGAINST A DoD COMPONENT ACTIVITY.**

o.  <u>TRADER v. DLA No. 95-3310</u>, initially a pro se employment discrimination and retaliation complaint. For the limited purpose to reach an agreement, a court appointment counsel was assigned to help the plaintiff. An agreement was reached and signed by all parties on or around June 1996. By letter dtd. 08/04/97 Trader, the plaintiff, informed the U.S. District Court For The Eastern District Of Pennsylvania that as of 08/04/97 the terms of agreement have NOT been met by the defendant DLA. The Court forced plaintiff to entered into a new settlement agreement with modified terms and less favorable to the plaintiff which included but not limited to the condition that he leaves DLA, which Mr. Trader did.

**9.  NONE OF THE PRO SE CASES CITED ON THIS DOCUMENT APPEARS ON THE WEB SITE.**

**10. A WEB SITE SEARCH BY NAME OF THE DEFENDANT DLA WITHIN THE U.S. DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA ALSO CAME BLANK. YET, the following employment discrimination and retaliation cases are known to have been filed against DLA:**
    o. ADAMS v. DLA 95-08088
    o. ADDANKI v. DLA 95-0696
    o. DIACONU v. DLA 94-7273
    o. SHAWN & DERYK v. DLA 94-
    o. HATTENBA v. DLA 93-6620
    o. DAVIS v. DLA 93-3242
    o. CUFFEE v. DLA 93-02731
    o. CUFFEE v. DLA 93-0268
    o. SPENCE v. DLA 92-3713
    o. BROOKS v. DLA 90-5660
    o. BENDER v. DLA 90-0858

**11. SEARCHING BY THE CASE NUMBER, THE WEB SITE PROVIDES <u>ONLY</u> THE MOTIONS MADE BY THE U.S. ATTORNEY'S OFFICE, <u>NOTHING</u> FROM THE PLAINTIFF PRO SE.**
    o. Case in point is BLUE v. DLA CLASS ACTION 04-2210.

In fact, the issue of missing from the WEB of ALL the cited cases it also one of the issues DIACONU et supra has addressed in her letter dtd. 02/03/06 to the Hon. Harvey Batle 3rd., Chief Judge U.S. District Court For The Eastern District Of Pennsylvania. As stated before, the honorable judge is yet to respond to Diaconu's letter.

Jefferson Health System

Roy A. Powell, President

May 15, 2001

To Whom It May Concern:

Examinee: Eufrosina Diaconu
Date of Visit: 3/28/01
Reason for Visit: Evaluation of Toxic Exposure
Individual Requesting Report: Eufrosinia Diaconu
Primary Care Physician Referral: Dr. Terry Waldman

Ms. Diaconu is a pleasant 59-year-old female with the complaint she sustained neurological damage from her five years of exposure to various pesticides while employed by the federal government as a civilian. I will explore the history as it was related to me on 3/28/01, and then render an opinion regarding causation.

## CHIEF COMPLAINT

Exposure to chemicals/asbestos/development of tremors.

## HISTORY OF CHIEF COMPLAINT

This pleasant 59 year old female, former environmental engineer for the US government, is involved in a class action lawsuit regarding her previous exposure to chlorinated hydrocarbon type of pesticides, stoddard solvents, VOC's, friable asbestos and numerous other hazardous and regulated substances and materials. She presents for evaluation regarding her history of exposure to determine if there is any relation of her current neurological symptoms to her stated exposure.

Her federal government employment history begins in August 1985 while working for the Defense Logistics Agency ("DLA") as a civil engineer technician at one of its field activities (Defense Personnel Support Center ("DPSC")) in Alameda, California. She stated that while working in California (1985 to 1990) she was in a perfect state of health. Effective July 1990 DLA / DPSC transferred her position to Philadelphia, Pennsylvania, converted it into a low level environmental engineer and, against her wishes, forced Ms. Diaconu to relocate to Philadelphia. She worked in this capacity until May 1995 when her employment was terminated.

She notes that while on site in Philadelphia there were heavy petroleum product smells along with the odor of natural gas throughout the site without any obvious source of these products. All

Frankford Campus, Frankford Avenue & Wakeling Street • Philadelphia, PA 19124
Torresdale Campus, Knights & Red Lion Roads • Philadelphia, PA 19114
Bucks County Campus, 380 North C

www.jeffersonhealth.org

EXHIBIT #2

buildings were originally built as warehouses and apparently later some of these were converted to offices. She also comments that the waste lines were improperly constructed, specifically wastewater and sewage were combined. Because the combined storm-sewer drain lines had no traps or back flow devices, during the heavy rainstorms raw sewage could be seen backing up in the first floor's drains and/or in the basements. In addition, she noticed a "white powder-like" substance inside and outside of buildings which she suspected from the beginning and later confirmed, that this was a residue from the insecticide, DDT.

During her five year period of employment Ms. Diaconu maintains she was exposed to VOC's (Volatile Organic Compounds), vapors of benzene, chlorinated hydrocarbon type of pesticides, asbestos, PCP, PCB, formaldehyde, a variety of solvents and acids, and residual radiation. She states there were other hazardous chemicals also on site to which she was exposed. As an Environmental Engineer she worked at least 50 hours per week and as part of her job she would have to inspect each building at least once a week from the basement up, to include several floors. Each building would take over a day to inspect. During the beginning of her employment in Philadelphia she was evaluated by an industrial hygienist for a respirator but because of her facial contour needed a custom fit mask which appeared like an oxygen mask. She maintains that Health and Safety refused to buy it for fear of alarming the general employee population. She notes that in particular during the early months of exposure, she had multiple episodes of vomiting, she became nauseated, had severe headaches, was constantly dizzy, was choking during her sleep, had cold sweats, and had constant chills whether inside or outside; she noticed losing a large amount of hair when she combed, and she felt constantly exhausted. She continues to have some of these symptoms even now.

Of particular note was that in the basement of one of the buildings there was housed a mixing production line which consisted of organic chlorine compounds such as DDT, Lindane, Chlordane, and Pentachlorophenol (PCP) and other chemicals. These were diluted with kerosene and/or other petroleum products since they are not water-soluble. This mixture of chemicals was then used to preshrink garments and other related items the government produced for service personnel. No personal protective equipment (PPE) were worn by any of the line personnel such as goggles, masks/respirators. Ms. Diaconu goes on to describe numerous buildings, that had no ventilation or very poor ventilation. In particular she described her work station which was in an office that had the entrance through Building # 8, although the office itself was an extension of Building # 2, a warehouse. The air intake for her office was actually located inside of the warehouse as opposed to outside of the building, which would be a proper location. Within this warehouse she maintains was housed several repair shops who used on a daily basis, mineral spirits; it housed several leaking PCB transformers; had friable asbestos, PCP, chlordane, DDT, along with rodent droppings. The same poor ventilation handled warehouse # 1 where Ms. Diaconu's work station was then moved. In October 1993 her work station was moved to Building # 6, a building where during the Second World War and during the Korean War was used by the U.S. Army as a mortuary, and was also used by the Directorate of Medical as a laboratory which generated nuclear, chemical and biological wastes.

As I previously mei... ..ned, the purpose of mixing chemicals was for preshrinking and moth proofing (not previously mentioned). She notes that no epidemiological studies were done to measure the ambient levels of chemicals at that time.

She reports there were sudden deaths by a number (unknown to her) of civilian employees who died within 24 hours after the Naval Ambulance was called in, picked them up, and transferred to other hospitals within the city, within one day.

The employee population numbered approximately 1200 on base with 4200 nationwide. She estimates that 1000 employees were heavily exposed to the applied chemicals. These were the seamstresses who fashioned the garments. Approximately 200 employees worked in the building used to make the chemicals and at least once a week, up to twice a month; the material was re-sprayed with the 'preshrinkage' chemical mixture. She recalls that these individuals wore no personal protective equipment.

She maintains the first sign that 'something was wrong at the base' was that she experienced a choking sensation at night. This is specifically described as feeling as though her airways were closing. On January 31, 1992 she fainted on site but acknowledges she was at odds with her supervisors when she demanded to be sent back to California. This was all because of her heightened awareness and concern about chemical exposure. During this fainting episode employees at the scene were able to recall she exhibited facial twitching. She has no recall of this event. Subsequent to this episode she went to her family doctor for evaluation. She was ultimately seen by a psychiatrist at the request of her family physician who identified 'agitation' and recommended a change of agency. She returned to work after two weeks, however the problem on base was maintained, and she began to collect samples. She apparently had wipe samples collected during March of 1991 which revealed the presence of DDT on the order of 350,000 parts per million.

She mentioned that by 1992 she discovered that many of the surplus materials such as, blankets, clothing, tents, parachutes, etc., manufactured by and stored at DPSC and treated with chlorinated hydrocarbon pesticides were being sent to Malaysia, Bosnia, China, and Japan as disaster relief in addition to being donated to homeless shelters, and to the Boy and Girl Scouts of America. Samples of cloth (wool-nylon for shirting) collected in September 1992 found 1555.362 ppm DDT and traces of toluene, naphthalene, and anthracene, which have not been quantified. An August 1992 laboratory analysis of cloth (duck tentage) found that it contained approximately 1414 ppm DDT, 1100 ppm PCP, 1000 ppm phenolics, 1000 ppm total halogens, 2.3 ppm lead, 2.1 ppm Ag, 3.3 ppm copper, 3.0 ppm nickel and 1.1 zinc.

Alarmed by her own declining health, despite the agency's steadfast continual denial and her classification as a trouble-maker, in late 1991 Ms. Diaconu convinced the U.S. Army Environmental Hygiene (AEHA) to come out and collect wipe samples from Building # 13 and Building # 9. AEHA's lab results found DDT in these buildings ranging from 300 to 350,000 ppm. Ms. Diaconu's employer, DLA/DPSC continued to deny that the base was a cesspool of pesticides and considered that AEHA's results were wrong. Believing that she was protected by the environmental law' employees' protection clause, in January 1993, Diaconu served her

employer with a 60 Days Notice of Intent To File A Citizen Suit with copies sent even to members of the U.S. Congress.

By September 1993 the Base Realignment And Closure Commission proposed and the President signed into effect that DPSC's Manufacturing Department to be closed effective 1 October 1993, the remaining DPSC's activities to be realigned, vacate the location and move into Northeast Philadelphia by 1997.

As DPSC continued to deny that the base was a cesspool of pesticides, that in the base some of its activities generated nuclear, chemical and biological waste, and because they wanted all warehouses to be converted into homeless shelters and the remaining of the buildings to be transferred to the City of Philadelphia as clean. In November 1994 Diaconu filed a citizen suit against DLA/DPSC. Due to this suit, DPSC was forced to address the base wide contamination issue and to make it public.

As a result, today all warehouses are demolished and since 1997 the numerous mandated environmental documents left at the Passyunk Free Library confirm what Diaconu suspected all along: the base was a cesspool of pesticides, its employees were exposed to friable asbestos, PCB, PCP, VOC's migrating into buildings from 10 foot deep petroleum product contaminated ground water, vapors of benzene, solvents, etc. Still not addressed in these documents is DPSC's activity that generated nuclear, chemical and biological waste.

After having another episode of seizure and complaining of chest pains, Ms. Diaconu was in observation for two days at the Parkview Hospital (8-10 February, 1995) and in sick leave until 6 April 1995. After returning to work on April 25, 1995 she filed a claim for injury and worker's compensation, which the agency refused, to process, instead terminated her employment effective 5 May 1995.

While employed, Diaconu was never evaluated for the type exposure shown by the documents left at Passyunk Library that existed. It seems that neither the US Department of Labor, nor its employees, including Diaconu, were ever informed by DLA/DPSC that they were working in a very hazardous environment, and that's why the agency refused to provide Diaconu with PPE and even refused to allow her to buy the equipment herself and use such in order not to alarm DPSC's employees and the neighbors. This is probably why she was diagnosed a having "anxiety attacks", when she was probably having a seizure. In addition, her continued inquiry into the working environment was viewed as an adjustment disorder. During her employment in Philadelphia she had three of these seizures: January 1992, February 1993, and February 1995.

Since 1997, retroactive to December 1996, the Social Security Administration found Diaconu to be totally and permanently disabled. Dr. Apollo Arenas has seen her for evaluation of her tremor, which was diagnosed as, "essential tremor".

Ms. Diaconu also stated that she was allergic to penicillin, valium, codeine, alcohol, and sulfites. She never drinks, smokes, nor experimented with any kind of illicit drugs. When in 1990, she was

relocated to Philadelphia, she walked a fast 5 miles every morning and enjoyed daily workouts in the gym located on the base.

None of her family has/had tremors. He mother died of a heart attack at 74 years of age; her father is 87 years of age and in excellent health. He is able to travel back and forth from Romania to here to take care of her for a year at a time.

I have reviewed the neurologist letters along with a variety of laboratory reports, which show elevation in the liver enzyme, AST, at almost twice top normal. In addition an ultrasound of the liver was performed which suggests the presence of fatty infiltration and / or fibrosis. There is a singular report of an elevated total eosinophil count of 671. (The top normal being 550). Three MRI 's of the brain were done. One performed on March 7, 1995 which was normal and the second MRI performed on September 21, 1999, which revealed mild cerebral atrophy (greater than expected for her age). The third was performed April 11, 2001, which revealed no change from the previous one of September 21, 1999.

## PHYSICAL EXAMINATION

<u>Vital signs</u> – B.P. = 150/100   Pulse = 64/min         Respirations = 14/min

This is an awake, alert, pleasant white female with a slow tandem gait assisted by a quad cane. There is a notable tremor of the head/neck, upper extremities, also involving the voice. The lower extremities exhibit mild tremor with intention. The tremor is of 3 to 4 cycles per second, which becomes notably worse with cerebellar testing of the upper extremities, specifically finger to nose.

- <u>Head</u> - reveals it to be atraumatic.
- <u>Eyes</u> - reveals the pupillary responses to light and the extraoccular eye muscles were normal. No nystagmus was noted. Fundi: sharp optic disk margins without evidence of hemorrhage or retinal exudates.
- <u>Ears</u> - The tympanic membranes are intact bilaterally.
- <u>Mouth</u> - reveals the tongue to have a normal appearance and coat. There are no extrapyramidal motions of the mouth or tongue. The soft pallet elevates symmetrically.
- <u>Neck</u> - reveals it to be supple without evidence of mass or carotid artery bruits.
- <u>Heart</u> - regular rate and rhythm. First and second heart sound were normal. No murmur was heard.
- <u>Lungs</u> - clear to auscultation in all fields with an occasional sibiliant rhonchi. No rales or crackles were heard.
- <u>Abdomen</u> - moderately obese, soft and non-tender. No organomegaly.
- <u>Extremities</u> - no clubbing, cyanosis or edema. A tremor as previously described above was noted.
- <u>Neurological</u> - Cranial Nerves 2 through 12 appear grossly intact. Cerebellar testing reveals a notable tremor of the upper extremities much worse with finger to nose actions. Heel toe walking appears OK. The deep tendon reflexes are 0 to +1 over +4 in both extremities and symmetric. The toes are down going bilaterally.

## DIAGNOSTICS

1. MRI Brain – 3/3/95; normal
2. MRI Brain – 9/21/99; mild atrophy, greater than expected for age.
3. MRI Brain – 4/11/01; no change from previous exam
4. Ultrasound of Abdomen – 11/14/00; suggested fatty infiltration and / or fibrosis of liver.
5. Ultrasound of Abdomen – 4/18/01; Unchanged from last study. Recommend CAT scan or biopsy.

## LAB TESTS

August 2000

1. AST/SGOT – elevated at 70 IU's/ml (normal 10-40)
2. Alkaline phosphates and bilirubin - normal
3. Fasting glucose – normal
4. Serum Calcium – normal
5. Renal Studies – normal
6. Pancreatic amylase – normal

1. CBC – September 4, 1998 – elevated eosinophils 671 cells/MCL  (top normal=550)
2. Hepatitis B surface antigen and antibody; 9/04/98– non-reactive (No evidence of hepatitis B infection)
3. Hepatitis C antibody; 9/04/98; – non reactive testing – (negative for Hepatitis C)
4. Alfa-fetoprotein (tumor marker) 9/04/98; 4.2 mg/ml (normal = < 8.1)

## Special Testing – Neuropsychiatric Testing – April 16, 2001

Organic disease based deficits / impairment confirmed to be present consistent with toxic exposure.  (See Dr. Terri Morris' complete report).

## Investigation of Individual Chemicals Reportedly Involved

1. **DDT** (dichlorodiphenyl trichloroethane), a pesticide which was banned in 1972 except for public health emergencies, is highly lipid soluble. It was reportedly found by wipe samples collected in 1991 from inside of B-13 / B-9 in concentration of over 350,000 ppm (parts per million). Laboratory analysis of cloth (wool-nylon for shirting) treated and stored in buildings that Diaconu had weekly inspected, done in September 1992 found 1555.362 ppm DDT and traces of toluene, naphthalene, anthracene, which have not been quantified. An August 1992 laboratory analysis of cloth (duck tentage) treated, stored and manufactured in the base found that it contained approximately 1414 ppm DDT, 1100 ppm pentachlorophenol, 1000 ppm phenolics, 1000 ppm total halogens, 2.3 ppm lead, 2.1 ppm Ag, 2.1 ppm As, 3.3 ppm copper, 3.0 ppm nickel, and 1.1 ppm zinc.  As a chemical, **DDT** is extremely long lasting from an environmental standpoint and, is considered to cause central nervous system (CNS) stimulation or depression.

On its own, the following is a list of the general toxic effects of DDT:

- Gait disturbance, tremors, vomiting, nausea, fatigue, convulsion, malaise

2. **Lindane** (gamma hexachlorocyclohexane) is the most toxic of all the HCH isomers. On its own, the direct handling (and those exposed non-handlers) of HCH has produced the following:

- Tremors, vomiting, headache, paresthesias, apprehension, ataxia, impaired memory, malaise, loss of sleep.

Liver function tests have been found to be statistically elevated by Kashyap (1986).

3. **Chlordane**: (termiticide) is a mixture of at least 50 different compounds. It can be detected in indoor air samples of houses 10-15 years after the initial application.

On its own, acute toxicity can include the following:
- Tremors, dyspnea, convulsions, dizziness, headache, seizures, visual changes, death.

The EPA ranks Chlordane as a "Probable Human Carcinogen".

4. **Pentachlorophenol (PCP)** is a substance used as a pesticide and a wood preservative.

On its own, the health effects may include:
- Airway/ocular irritation, symptoms of bronchitis/chest tightness, tachycardia, abdominal pain, pulmonary edema.

PCP has been shown to produce on its own, fatty infiltration of the liver and increased liver function studies (elevated liver enzymes). The target organs identified for pentachlorophenol are the liver, kidney, hematopoietic, pulmonary, and CNS (central nervous system).

5. **Polychlorinated Biphenols (PCB's)** can be found in pesticides, industrial electrical products, and paint extenders.

The recognized toxicity, on its own, in humans is mostly the development of chloracne and liver toxicity.

6. **Benzene**, an aromatic hydrocarbon has been used extensively in industry as a solvent and a chemical intermediate. Chronic benzene exposure (meaning months of exposure) may result in toxicity to the hemopoietic and immune systems with a well recognized association with acute myelogenous leukemia (AML).

7. **Stoddard solvent / mineral spirits:** Stoddard solvent consists of 15-20% aromatic hydrocarbons and 80-85% paraffin and naphthenic hydrocarbons. The TLV for Stoddard is 100 ppm as a TWA. Stoddard solvent exposure can cause **CNS toxicity** manifested as (CNS) depression. The actually toxicity is related to the aromatic and aliphatic hydrocarbon content. "The odor threshold for Stoddard's is 0.9 ppm, and the irritative properties and odor are not sufficient to provide adequate warning to prevent dangerous concentrations and thus serious exposures. *(Sullivan & Kreiger p. 1122).*

8. **Kerosene:** One of the various forms of hydrocarbons or petroleum distillates. The toxicity is inversely proportional to its viscosity (high viscosity = low toxicity / low viscosity = high toxicity). Kersosene has a low viscosity and therefore can be considered highly toxic. Kerosene is considered very damaging to the lung if inhaled. *(Casarett and Doull's Toxicology The Basic Science of Poisons. Fourth Edition Chapter 28 p. 935)*

9. **Volatile organic compounds (VOC's):** Examples of this include benzene, tetrachloroethylene, and 1,1,1-trichloroethane. As with my discussion on solvents, these are considered to be both toxic to the liver and central nervous system.


# DISCUSSION

As related to me, in 1995 Ms. Diaconu was diagnosed by her neurologist, Apollo M. Arenas, M.D., of Community Neurological Services, P.C., as having Essential Tremor (ET). We have no reason to question this diagnosis because of the three listed MRI's of the brain validate Dr. Arenas' diagnosis. Some medical literature suggests that 50 % of ET cases are familial. This means that ET is a disease that can be inherited. There are no relatives of Ms. Diaconu who had/have tremor known to her. Therefore, **we are dealing with the non-inherited 50% subset of the disease.**

Prior to her five-year, 1990 to 1995 exposures to chlorinated hydrocarbon type of pesticides and other hazardous chemicals, Ms. Diaconu was in a very good state of health. In fact in 1990 within two weeks after her arrival in Philadelphia, although she was a DPSC employee since 1985 working in Almeda, California, as a prerequisite of employment, she was sent by DPSC for a general medical checkup (blood, x-rays, etc.) to the Naval Hospital in South Philadelphia, from where she verbally received a clean bill of health.

Since Ms. Diaconu was exposed to chlorinated hydrocarbon type of pesticides and other hazardous chemicals by virtue of not being provided with any personal protective equipment (PPE) yet, she was required to spend her days inspecting buildings where, on a regular basis in the past and while she worked there, rolls of uncut cloths were directly treated during the preshrinking process with various formulas of pesticides. These treated cloths were then cut into goods. Of great significance is her direct and unprotected exposure during her weekly inspections of the chemical plant's "Mixing Room" section and of the "Preshrinkage Section", which were

both relatively open    as with no ventilation, or at best, having extremely poor ventilation ("Preshrinkage Section").

Equally significant is her unprotected weekly inspections of all the buildings in the base, where at any given time in the past or during her employment, the treated uncut rolls of cloth and the treated made goods were stored because, in order to preserve their quality, once in storage, they continued to be treated weekly with various formulas of mixed pesticides. The ventilation was also very poor.

I believe that the daily, unprotected, chronic exposure equates with a significant level of exposure, a level that directly contributed to Ms. Diaconu's neurological condition. We have no record of either an industrial hygienist monitoring the areas inspected by Ms. Diaconu or any epidemiological or health studies performed by the Agency during the above period of time to contradict us.

As related to me by Ms. Diaconu, after the base closed, as the buildings became vacant, wipe samples collected from inside of those buildings found high levels of DDX and DDE, metabolites of DDT. For the unbelieving, the levels of DDE was measured in a population of people who lived within a mile from a Superfund site. Those who lived closer had higher levels of DDE, simply by living near the location. They were not employees, simply habitants (*Vine MF et al Effects on the immune system associated with living near a pesticide dumpsite. Environmental Health Perspective 2000 December; 108 (12): 1113-24*).

I have previously outlined in this report the individual chemicals of concern. As you can see a common element of these chlorinated hydrocarbon type of pesticides is their ability to cause central nervous system effects such as, tremors, vomiting, convulsions or seizures (which Ms. Diaconu had in January 1992, February 1993, and February 1995). This is because of the hydrocarbon affinity for nervous tissue, which has a high fat content. Once in fat or lipid tissue, the chemical may remain for a long time.

Ms. Diaconu's exposure to lipid soluble chemicals came as a result of her weekly inspection duties and from any significant time spent at her own workstation. Her workstation was at first in an extension of warehouse # 2 converted into an office. She was then moved to a section of warehouse # 1 which was converted to an office, then back to the warehouse # 2 office. These offices received their ventilated air from inside the warehouse, which continued to be sprayed with pesticides. Effective October 1993, Ms. Diaconu's workstation was moved to Building # 6. In accordance with Ms. Diaconu, prior to being converted into office space, this building was also a warehouse, which during the years was used in various capacities. For instance, during the Second World War and Korean War, the building was used by the U.S. Army as a mortuary. Later it was used as a medical laboratory where nuclear, chemical and biological experiments took place. It was also used as a warehouse for storage of clothing and so on. After her workstation was moved to Building # 6, Ms. Diaconu continued to perform her weekly inspections in all the buildings up until April 1994. After April 1994 up until May 1995 her duties required her to enter all the buildings but not on a weekly basis as before.

Of significance is the fact that during September 1990 to April 1994, Ms. Diaconu's duties also required her to collect samples and to handle the disposal of a wide variety of regulated and hazardous chemicals and materials without being provided PPE.

With no direct evidence that the buildings Ms. Diaconu entered on a daily basis, and with no direct evidence that the buildings that once housed her work station have ever been cleaned / decontaminated, it is obvious that during her entire employment as an environmental engineer, without being provided PPE, Ms. Diaconu was exposed to a very wide range of hazardous chemicals including but not limited to, chlorinated hydrocarbon type of pesticides, solvents, VOC's, PCB'S, etc., which places her at risk for other long term effects, such as pancreatic cancer (*Ji BT et al AM J Ind Med 2001 Jan; 39 (1):92-9*) and breast cancer (*Cancer Epidemiology Biomarkers Prev 2000 Nov; 9 (11): 1241-9*), etc.

## Solvent Toxicity

With respect to the toxic effects of solvents, there are two organ systems, which have been long recognized medically to be, target organs: **liver and central nervous system.** I have previously outlined the individual toxicities of the solvents Ms. Diaconu was exposed to, and when combined, can only have a potentiating effect on a human biological system. The chronic effects of solvents can be summed up to include liver damage and central nervous system damage, manifest as neurobehavioral disturbances, cerebral atrophy, ataxia, memory losses, neuropsychological changes, fatigue, to name a few. (*Popendorf W. Vapor pressure and solvent vapor hazards. Am Ind Hyg Assoc J 1984; 45: 719-726*).

Ms. Diaconu has diagnostic testing evidence of liver fibrosis and / or fatty infiltration. Fatty degeneration in the liver has been held to be reversible, in that this is one of the earliest stages of liver disease. Fatty liver changes have been documented to be from chronic solvent exposure. (*Eur J Clin Invest 1983 Apr; 13(2): 151-7*). Another study done in 1982 looked at industrial chemical workers and painters; the findings demonstrated that occupational exposure to chemical solvent may insidiously damage the liver. (*Acta Med Scan 1982; 212(4): 207-15*)

Once the liver has been repeatedly inflamed by chemical exposure, attempts to heal itself ultimately lay down scar tissue called fibrosis. Once fibrosis is formed, it is considered permanent.

In order to determine whether one or both of the above are present within Ms. Diaconu's liver, she must undergo further testing. Performing a liver biopsy would enable her treating physician to determine if irreversible fibrosis were present as opposed to reversible fatty changes.

We have seen that Ms. Diaconu does not have laboratory evidence of viral hepatitis, (Hepatitis B or C), and is not nor has been a drinker of alcohol. Without an infectious or alcohol abuse history, this helps to confirm an occupational exposure as the cause of her liver findings.

Ms. Diaconu has evidence by MRI of the brain on two occasions, which revealed the presence of cerebral atrophy (shrinkage of the brain), more than expected for her age. No brain based tumors, or findings consistent with stroke have been found on three MRI's.

The literature supports the detection of solvent-induced cerebral atrophy in advanced cases by imaging the brain. *(Bruhn P, Arlien-Soborg P, Gyldensted C, et al: Prognosis in chronic toxic encephalopathy. A two-year follow up study in 26 house painters with occupational encephalopathy. Acta Neurol Scand 1981; 64:259-272 and Juntunen J et al: Neurologic picture of organic solvent poisoning in industry. A retrospective clinical study of 37 patients. Int Arch Occup Environ Health 1980; 46: 219-231).*

# CENTRAL ORIGIN OF ESSENTIAL TREMOR

Ms. Diaconu has a kinetic movement disorder called Essential Tremor (ET), as diagnosed by her neurologist. She manifests the disease by an uncontrollable shaking of her hands, head, voice, and lower extremities. The central nervous system (brain and spinal cord) intimately controls all of these effected areas. When areas of the brain which control movements are damaged, we see the end result such as tremor or an abnormal gait. The neurology literature recently pointed out the origin of ET to be from a deep area of the brain called the inferior olive and the cerebellum. Special neurologic studies called, electrophysiologic studies, have been consistent with a central area of brain being the source of the tremor. *(Neurology 2000; 54(11 Suppl 4):S14-20.*

## Exposure to Friable Asbestos

Ms. Diaconu's regular chest x-ray read by a general radiologist does not show signs of asbestosis, however, when read by a specially trained person called a, "B-reader", there are signs of early lung disease attributable to inhaled dust and / or a result of lung inflammation. Since the lag time from first exposure to asbestos to the development of obvious disease can take up to 20 to 40 years, we need more time to observe and medically monitor. Ms. Diaconu should have yearly chest x-rays read by a "B-reader". Asbestos exposure puts one at risk for cancer of the lung and the surrounding membranes called the pleura. This type of cancer is known as, "mesothelioma", and the only known cause is exposure to asbestos.

## Description of The Impairment

Ms. Diaconu was declared totally and permanently disabled by The Social Security Administration in January 1997, retroactive to December 1995. She receives a small monthly benefit from them.

She has been unable to work because of the progressive tremor of her hands, voice, lower trunk, and head. It is irreversible. She has the inability to climb stairs and only with great difficulty maneuvers with a walker. She will ultimately become wheelchair bound. Unfortunately, medication her neurologist tried did not work and her condition progressed.

## Reference For Clinical Toxicology and Health Effects  (If not specifically listed otherwise)

Hazardous Materials Toxicology; Clinical Principles of Environmental Health. Sullivan & Krieger 1992

## Summary of References Listed in This Report (Over 600 Abstracts Searched)

1.  Vine MF et al Effects on the immune system associated with living near a pesticide dump. Environmental Health Perspective 2000 December; 108 (12): 1113-24.
2.  Ji BT et al AM J Ind Med 2001 Jan; 39 (1): 92-9.
3.  Cancer Epidemiology Biomarkers Prev 2000 Nov; 9 (11): 1241-9.
4.  Popendorf W. Vapor pressure and solvent hazards. Am Ind Hyg Assoc J 1984; 45: 719-726
5.  Eur J Clin Invest 1983 Apr; 13 (2): 151-7
6.  Acta Med Scan 1982; 212 (4): 207-15
7.  Bruhn P et al: Prognosis in chronic toxic encephalopathy.  A two-year follow up study in 26 house painters with occupational encephalopathy.  Acta Neurol Scand 1981; 64:259-272
8.  Juntunen J et al: Neurologic picture of organic solvent poisoning in industry.  A retrospective clinical study of 37 patients.  Int Arch Occup Environ Health 1980; 46: 219-231
9.  Neurology 2000; 54 (11 Suppl 4): S14-20
10. Other references: Casarett and Doull's Toxicology  The Basic Science of Poisons Fourth Edition
11. Williams and Burson: Industrial Toxicology; Safety and Health in the Workplace Copyright 1985
12. Carl Zenz: Occupational Medicine Second Edition

## CONCLUSION

With a reasonable degree of medical certainty, based on my professional capacity as Medical Director of WorkHealth, based on my medical experience and formal education in the medical field in general and in occupational and environmental medicine in particular, as a recognized and Board Certified member of the American Osteopathic College of Preventive Medicine, and The American College of Occupational and Environmental Medicine, and based on what Ms. Diaconu related to me; review of pertinent laboratory and diagnostic reports and review of global literature concerning pesticides:

1.  I believe the tremor is related to damage caused to the central nervous system by her exposure to chlorinated types of pesticides and other exposures, except asbestos.

2.  I believe the liver findings of fatty infiltration and / or fibrosis are a result of chronic solvent exposure. This is caused by repeated exposure to solvents causing liver inflammation with an attempt by the liver to heal itself, producing scar tissue known as, fibrosis.

3.  I believe that although Ms. Diaconu is allergic to penicillin, alcohol, codeine, valium and sulfites, her allergies did not cause her current irreversible condition nor did it cause (liver) fatty infiltration and /or fibrosis. There are no medical studies to suggest other conclusions.

4.  The results of the neuropsychological studies support an organic impairment consistent with solvent exposure. (Please refer to the Dr. Terri Morris report).

5.  I believe that Ms. Diaconu's current medical condition-irreversible neurological tremor and her fatty and / or fibrosis of her liver is the end result of her working five years as an environmental engineer. Neither her family history nor her physical/medical condition when she began her employment in Philadelphia suggests any other conclusion.

As with all patients who present with chronic health problems, ongoing medical follow up with the primary care physician is always recommended for continued surveillance.

This opinion is the result of a consultation visit and is not intended to provide the basis for ongoing care with myself. Follow up suggestions were given to the patient for her family physician to consider.

This opinion is expressed with the information presented to me at or around the time of patient presentation.

Martin Pieretti, DO., MPH, CIME
Medical Director – WorkHeath
Board Certified Occupational & Environmental Medicine


Cc: Dr. Terry Waldman

## PRIVACY ACT NOTICE

This Notice is provided in accordance with the Privacy Act, 5 U.S.C. 552a(e)(3), and concerns the information requested in the letter to which this Notice is attached.

A. *Authority:* The requested information is solicited pursuant to one or more of the following:  5 U.S.C. 301, 38 U.S.C. 501 et seq., 28 U.S.C. 2671 et seq., 28 C.F.R.

B. *Principal Purpose:* The information requested is to be used in evaluating claims.
C. *Routine Use:* See the Notices of Systems of Records for the agency to whom you are submitting this form for this information.
D. *Effect of Failure to Respond:* Disclosure is voluntary. However, failure to supply the requested information or to execute the form may render your claim

## INSTRUCTIONS
### Complete all items - insert the word NONE where applicable

A CLAIM SHALL BE DEEMED TO HAVE BEEN PRESENTED WHEN A FEDERAL AGENCY RECEIVES FROM A CLAIMANT, HIS DULY AUTHORIZED AGENT, OR LEGAL REPRESENTATIVE AN EXECUTED STANDARD FORM 95 OR OTHER WRITTEN NOTIFICATION OF AN INCIDENT, ACCOMPANIED BY A CLAIM FOR MONEY DAMAGES IN A <u>SUM CERTAIN</u> FOR INJURY TO OR LOSS OF

    Any instructions or information necessary in the preparation of your claim will be furnished, upon request, by the office indicated in Item #1 on the reverse side. Complete regulations pertaining to claims asserted under the Federal Tort Claims Act can be found in Title 28, Code of Federal Regulations, Part 14. Many agencies have published supplemental regulations also. If more than one agency is involved, please state each agency.
    The claim may be filed by a duly authorized agent or other legal representative, provided evidence satisfactory to the Government is submitted with said claim establishing express authority to act for the claimant. A claim presented by an agent or legal representative must be presented in the name of the claimant. If the claim is signed by the agent or legal representative, it must show the title or legal capacity of the person signing and be accompanied by evidence of his/her authority to present a claim on behalf of the claimant as agent, executor, administrator, parent, guardian or other representative.
    If claimant intends to file claim for both personal injury and property damage, claim for both must be shown in Item 12 of this form.

    The amount claimed should be substantiated by competent evidence as follows:
    *(a)* In support of the claim for personal injury or death, the claimant should submit a written report by the attending physician, showing the nature and extent of injury, the nature and extent of treatment, the degree of permanent disability, if any, the prognosis, and the period of hospitalization, or incapacitation, attaching itemized bills for medical, hospital, or burial expenses actually incurred.

PROPERTY, PERSONAL INJURY, OR DEATH ALLEGED TO HAVE OCCURRED BY REASON OF THE INCIDENT. THE CLAIM MUST BE PRESENTED TO THE APPROPRIATE FEDERAL AGENCY WITHIN <u>TWO YEARS</u> AFTER THE CLAIM ACCRUES.

    *(b)* In support of claims for damage to property which has been or can be economically repaired, the claimant should submit at least two itemized signed statements or estimates by reliable, disinterested concerns, or, if payment has been made, the itemized signed receipts evidencing payment.

    *(c)* In support of claims for damage to property which is not economically repairable, or if the property is lost or destroyed, the claimant should submit statements as to the original cost of the property, the date of purchase, and the value of the property, both before and after the accident. Such statements should be by disinterested competent persons, preferably reputable dealers or officials familiar with the type of property damaged, or by two or more competitive bidders, and should be certified as being just and correct.

    *(d)* Failure to completely execute this form or to supply the requested material within two years from the date the allegations accrued may render your claim "invalid". A claim is deemed presented when it is received by the appropriate agency, not when it is mailed.

**Failure to specify a sum certain will result in invalid presentation of your claim and may result in forfeiture of your rights.**

Public reporting burden for this collection of information is estimated to average 15 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden,

to  Director, Torts Branch
    Civil Division
    U.S. Department of Justice
    Washington, DC  20530

and to the
Office of Management and Budget
Paperwork Reduction Project (1105-0008)
Washington, DC  20503

## INSURANCE COVERAGE

In order that subrogation claims may be adjudicated, it is essential that the claimant provide the following information regarding the insurance coverage of his vehicle or property.

| 15. Do you carry accident insurance? | Yes, if yes, give name and address of insurance company *(Number, street, city, State, and Zip Code)* and policy number. | No |
|---|---|---|

N/A

| 16. Have you filed claim on your insurance carrier in this instance, and if so, is it full coverage or deductible? | 17. If deductible, state amount |
|---|---|

N/A

18. If claim has been filed with your carrier, what action has your insurer taken or proposes to take with reference to your claim? *(It is necessary that you ascertain these facts)*

N/A

| 19. Do you carry public liability and property damage insurance? | Yes, if yes, give name and address of insurance company *(Number, street, city, State, and Zip Code)* | No |
|---|---|---|

N/A

SF 95 (Rev. 7-85) BACK

**EUFROSINA DIACONU**
533 East Luray Street
Philadelphia, PA 19120

RE: LETTER ANNETTA FOSTER GIVHAN TO DIACONU dtd. 05/07/07

Hon. **LOUIS H. PLLAK,**
Senior Judge
U.S. District Court
16613United States Courthouse
601 Market Street
Philadelphia, PA 19106-1777

May 15, 2007

BY CERTIFIED MAIL 7006 2150 0002 5308 7125

Your Honor,

The "cc" on the second page of the referenced letter indicates that you and Ms. SANDRA GUYDON, Esq. Defense Supply Center Philadelphia ("DSCP") each received a copy.

I consider the referenced letter a gauzy in-your-face declaration of superiority: as a pro se, I was then (1998 & 2002) and I still am today at the mercy of the U.S. Attorney's Office Philadelphia. The referenced letter just proved my position that in this part of the world the E.D. Pa. is here only to please the U.S. Attorney's Office Philadelphia; "jump" they say and the E.D. Pa. is asking "how high ?".

To get an ideia of my reaction to the referenced letter, I am sending you a courtesy copy of the letter I just mailed to Mr. PATRICK L. MEEHAN, U.S. Attorney, Philadelphia.

I feel obligated to write to you because of my genuine concern for Mrs. BUTLER S. DOROTHY the co-plaintiff of the class action toxic tort case DIACONU & BUTLER v. DLA & EPA case No. 98-6588 E.D. Pa.:

1. Having Mrs. Butler's toxic tort case assigned to Ms. Annetta Foster Givhan, Assistant U.S. Attorney who is NOT AN ENVIRONMENTAL LAWYER it's a wrong start. She can't possibly understand DIACONU et supra not only because she doesn't strike me as being smart but, because DIACONU et supra is a very complex case. Taking me and the members of the class out of the case, does not reduce the complexity of the case, it does not convert the case from toxic tort into a labor relation or FECA case; the DLA/DPSC's violations of the environmental laws, the commerce laws and so on are still present.

2. Relying on the informations provided by Ms. Sandra Guydon, Esq. DSCP is also very wrong. SHE IS NOT AN ENVIRONMENTAL LAWYER, she is a discrimination lawyer. If anything, Ms. Guydon is

ENCL. #1

unlicensed chemical plant, illegally engaged in experimenting with chemicals and using chemicals such as DDT banned since 1972 just to name a few. **(iii)** No worker such BUTLER was, it was ever informed that they were exposed to ultra-hazardous/deadly chemicals and materials. NOT EVEN MY PD as an environmental engineer GS 0819-11 not even remotely could suggest any illegal activity. YET, EHB beyound any doubt has found DPSC liabled for its illegal activities. **(iv)** DPSC WAS NOT A MILITARY BASE used for military training with live or fake ordinance; DPSC WAS NOT A MILITARY DEPOT to store fuel, chemical/ biological/nuclear weapons where one can expect to be exposed to some hazardous conditions. Every year, through DLA, the Congress allocated funds to DPSC for providing food, clothing and medical support !
**(v)** The fact that the property owner of this facility was the U.S. Army, and the fact that this facility was dated back to the Civil War, is irrelevant. What's relevant is the fact that DPSC at all relevant times knew that was engaging in illegal activities; knew that was killing its civilian employees and KNEW THAT THE E.D. Pa. will back them up !

It will be a waste of tax-payers money to litigate Butler's portion of the case. The EHB already proved DLA/DPSC being liabled; DLA/DPSC already admited liability when paid the City Of Philadelphia & to PHA over $ 100 million dollars. While in most of the toxic tort cases plaintiff's testimony was not sufficient to create geniune issue of material fact, Butler's skin disorder it was medically traced to the chemicals and materials she worked with. As far as her cancer goes, the cocktail of the chemicals Butler was exposed to is carcinogetic only supports the theory of the latency between exposure and the detectable physical injury. It is well admitted by the courts and medical establishments that the latent period for most cancers, that is the time between exposure to a carcinogen and the diagnosis of the disease can be 10 to 20 years, even more.
Mr. Butler had her cancer surgery in 1998. Since then, it seems that the cancer did not reoccurre; that doesn't mean that she is free of cancer. The cancer may reappear in other parts of her body now or 10 or 20 years from now. THEREFORE, when you decide Butler's compensation you must take into account not only the cancer she was operated for but, for future injuries on the theory that plaintiff cannot split a cause of action.

Respectfully,

EUFROSINA DIACONU

Encl.

cc: . W.J. Haynes, Gen Counsel DoD
    . Dorothy S. Butler (w/o encl.)

**EUFROSINA DIACONU**
· 533 East Luray Street
Philadelphia, PA 19120

DEPARTMENT OF JUSTICE
E.D. OF PA.
2007 MAY 16  A 9: 33

**RE: LETTER ANNETTA FOSTER GIVHAN-AUS TO DIACONU dtd. 05/07/07**

U.S. Department of Justice
ATTN.: **PATRICK L. MEEHAN,**
         U.S. Attorney
         Eastern District Of PA.
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106-4476                    May 15, 2007

<u>BY CERTIFIED MAIL 7006 2150 0005 5919 7931</u>

Mr. Meehan,

What were you thinking when you OKed the referenced letter to be sent to me ? Didn't cross your mind that I'll view it as a gauzy, arrogant in-your-face declaration of superiority as well as a conscious and deliberate act of intimidation ? From what hole in the ground do you select your assistants because smart they are not. Read the entire letter and see what I mean.

YOU HAVE UNTIL **JUNE 15, 2007:**
a. explain the meaning of "**RE:** Diaconu/United States Of America
                              <u>Eastern District Of Pennsylvania</u>"-
   see ENCLOSURE.
b. Explain why the CLAIM FOR DAMAGE, INJURY OR DEATH FORM, which exists since 1985, it was not offerred during the 3rd. Circuit's effort to settle the case ? Myself, Butler & the members of the class we all wanted then to settle. IT WAS YOUR OFFICE WHO OPPOSED IT !
c. Explain why the form wasn't sent <u>and</u> to Mrs. BUTLER S.DOROTHY, co-plaintiff ? How about the members of the class ?
d. WHAT THE HELL do you mean "cancer allegedly diagnosed" ? How rude and <u>what a arrogance in your part</u> !! Do you think that someone will "allege" having a deadly disease such as cancer is ? Cancer is not something you bragg about it but suffer enormously, you moron !

I hope you will respond to this letter because if you don't, eventually someone from DOJ will do it. Thank you !

Encl.                        EUFROSINA DIACONU

cc: . W.J. Haynes, General Counsel DoD
    . Hon. L.H. Pollak, Sen. Judge, E.D. Pa.

**EUFROSINA DIACONU**
533 East Luray Street
Philadelphia, PA 19120

RE: LETTER ANNETTA FOSTER GIVHAN-AUS TO DIACONU dtd. 05/07/07

U.S. Department of Justice
ATTN.: **PATRICK L. MEEHAN,**
        U.S. Attorney
      Eastern District Of PA.
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106-4476                    May 15, 2007

BY CERTIFIED MAIL 7006 2150 0005 5919 7931

    Mr. Meehan,

    What were you thinking when you OKed the referenced letter to
be sent to me ? Didn't cross your mind that I'll view it as a
gauzy, arrogant in-your-face declaration of superiority as well
as a conscious and deliberate act of intimidation ? From what
hole in the ground do you select your assistants because smart
they are not. Read the entire letter and see what I mean.

    YOU HAVE UNTIL **JUNE 15, 2007:**
**a.** explain the meaning of "**RE:** Diaconu/United States Of America
                            Eastern District Of Pennsylvania"-
    see ENCLOSURE.
**b.** Explain why the CLAIM FOR DAMAGE, INJURY OR DEATH FORM, which
    exists since 1985, it was not offerred during the 3rd.
    Circuit's effort to settle the case ? Myself, Butler & the
    members of the class we all wanted then to settle. IT WAS YOUR
    OFFICE WHO OPPOSED IT !
**c.** Explain why the form wasn't sent and to Mrs. BUTLER S.DOROTHY,
    co-plaintiff ? How about the members of the class ?
**d.** WHAT THE HELL do you mean "cancer allegedly diagnosed" ? How
    rude and what a arrogance in your part !! Do you think that
    someone will "allege" having a deadly disease such as cancer
    is ? Cancer is not something you bragg about it but suffer
    enormously, you moron !

    I hope you will respond to this letter because if you don't,
eventually someone from DOJ will do it. Thank you !

Encl.            EUFROSINA DIACONU

cc: . W.J. Haynes, General Counsel DoD
    . Hon. L.H. Pollak, Sen. Judge, E.D. Pa.

ENCL.#2

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

EUFROSINA DIACONU               :   CIVIL ACTION

          v.                  :

WILLIAM PERRY, SECRETARY      :
OF DEFENSE                   :   NO. 96-0214

MEMORANDUM

Bartle, J.                                 December 10, 1996

       Plaintiff Eufrosina Diaconu, a former employee of the Defense Logistics Agency, brought a sex discrimination action pursuant to 42 U.S.C. §§ 2000e et seq. ("Title VII"), against William Perry, the Secretary of Defense, as head of that agency. Plaintiff's case proceeded to a jury trial, at which she represented herself. The jury rendered a verdict in favor of the Secretary of Defense. Plaintiff now belatedly requests the appointment of counsel pursuant to 28 U.S.C. § 1915(e)(1).

       In Tabron v. Grace, 6 F.3d 147 (3d Cir. 1993), cert. denied, 114 S. Ct. 1306 (1994), the Court of Appeals for the Third Circuit announced the factors which a district court should consider in determining whether to appoint counsel under 28 U.S.C. § 1915. Unlike the present situation, that case involved the appointment of counsel before any trial had taken place. In Tabron, we are directed to consider: (1) the merits of the plaintiff's claim in fact and in law; (2) the plaintiff's ability to present his or her case; (3) the difficulty of the particular legal issues; (4) the degree to which factual investigation will be required and the ability of the indigent plaintiff to pursue

9

such an investigation; (5) and whether the case is likely to turn on credibility determinations.  Id. at 155-56.

Plaintiff contends that she should be appointed counsel because she is indigent, receives public assistance, and her physical condition prevents her from adequately trying her case. We note initially that one of plaintiff's claims had enough merit to survive summary judgment and to proceed to trial.  This court has had the opportunity to view plaintiff actually trying her case.  While plaintiff has a condition which causes her hands and voice to tremble, she was certainly able adequately to present her case.  She was knowledgeable about the federal rules of civil procedure and handled herself extremely well during trial, especially for a person with no formal legal training.  Moreover, the legal issues were not complex.  While plaintiff's case required a fair amount of factual investigation, the plaintiff ably pursued such investigation.  Finally, although the case did turn to a certain extent on credibility determinations, plaintiff was able to adequately cross-examine the witnesses to test their credibility.

Now that the trial has occurred and the jury has rendered its verdict, we find that any further pursuit of this case by plaintiff would be frivolous and not in good faith.  See 28 U.S.C. §§ 1915(a)(3), (e)(2).

In conclusion, the request of plaintiff for appointment of counsel will be denied.

-2-

10

## CERTIFICATE OF SERVICE

The undersigned attorney for defendant Secretary of the Department of Defense certifies that she has this date served a copy of the foregoing Memorandum of Law in Opposition to Plaintiff's Motion to Amend the Caption by first class mail, postage prepaid, upon plaintiff as follows:

Eufrosina Diaconu, <u>Pro Se</u>
533 East Luray Street
Philadelphia, PA 19120

Annetta Foster Givhan
Assistant United States Attorney

Dated:   March 7, 2005

Source: Legal > Cases - U.S. > District & State Courts - By State > PA Federal District and State Courts (i)
Terms: **diaconu and date(geq (01/01/96) and leq (12/31/02))** (Edit Search)

☞ Select for FOCUS™ or Delivery
▣

*1998 U.S. Dist. LEXIS 20629, \**

**DIACONU** EUFROSINA, BUTLER S. DOROTHY, on behalf of themselves and all others as defined below v. DEFENSE LOGISTICS AGENCY; DEFENSE SUPPLY CENTER PHILADELPHIA; HON. DAVID COHEN, Secretary of Defense; JOHN BRAVO, Director, Office of Health Safety & Environment; ENVIRONMENTAL PROTECTION AGENCY; CAROL M. BROWNER, Administrator

C.A. NO. 98-6533

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

1998 U.S. Dist. LEXIS 20629

**December** 29, 1998, Decided

**DISPOSITION:** [*1] Motion of plaintiff Butler S. Dorothy for reconsideration of the court's order of December 17, 1998 GRANTED. Portion of the December 17, 1998 order striking the claims of Butler S. Dorothy VACATED. Motion of Butler S. Dorothy and **Diaconu** Eufrosina for court appointed counsel DENIED.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff moved for reconsideration of the court's order striking plaintiff's claims and also filed a motion for court appointed counsel.

**OVERVIEW:** The court issued an order striking plaintiff's claims. Plaintiff moved for reconsideration of the court's order and filed a motion for court appointed counsel. The court granted the motion for reconsideration, and the order was vacated, but denied the motion for court appointed counsel because this case did not present circumstances requiring appointment of counsel, as there was no involved investigation to be done by plaintiff, nor evidence to be obtained, and, at trial, plaintiff would merely be telling her story to the jury.

**OUTCOME:** Motion for reconsideration was granted and court's order was vacated but motion for court appointed counsel was denied because this case did not present circumstances requiring appointment of counsel as there was no involved investigation to be done by plaintiff, nor evidence to be obtained, and at trial plaintiff would merely be telling her story to the jury.

**CORE TERMS:** appointment of counsel, special circumstances, legal issues, appointment, indigent, appointed

### LexisNexis(TM) HEADNOTES - Core Concepts - ♦ Hide Concepts

▢ Civil Procedure > Counsel
*HN1* ✦ Appointment of counsel in an in forma pauperis civil proceeding is a mater of discretion of a district court. It is a privilege and not a right.

▢ Civil Procedure > Counsel

HN2↓ 28 U.S.C.S. § 1915(e) vests a court with broad discretion to appoint counsel for an indigent in a civil action where the circumstances would properly justify it.

Civil Procedure > Counsel

HN3↓ A request for appointment of counsel is usually only granted upon a showing of special circumstances indicating the likelihood of substantial prejudice to him resulting, for example, from his probable inability without such assistance to present the facts and legal issues to the court is a complex but meritorious case. As a threshold matter, the district court must consider the merits of plaintiffs claim. If the district court determines that the claim has an arguable basis in law and fact, it should consider a number of other factors. These include the following: the plaintiff's ability to present his case taking into account plaintiff's education, literacy and prior litigation experience; the difficulty of the particular legal issues; the degree to which factual investigation will be required and the ability of the indigent plaintiff to conduct such investigation; the amount of discovery required and the degree to which the case is likely to turn on credibility determinations.

**COUNSEL: DIACONU** EUFROSINA, PLAINTIFF, Pro se, PHILADELPHIA, PA USA.

**JUDGES:** CHARLES R. WEINER.

**OPINIONBY:** CHARLES R. WEINER

**OPINION: MEMO/ORDER**

The motion of plaintiff Butler S. Dorothy for reconsideration of the court's order of December 17, 1998 is GRANTED.

That portion of the December 17, 1998 order striking the claims of Butler S. Dorothy is VACATED. The Clerk is DIRECTED to enter on the docket the copy of plaintiffs' complaint which is signed by both co-plaintiffs.

The motion of Butler S. Dorothy and **Diaconu** Eufrosina for court appointed counsel is DENIED.

HN1↑ Appointment of counsel in an in forma pauperis civil proceeding is a mater of discretion of a district court. Ray v. Robinson, 640 F.2d 474, 477 (3d Cir. 1981). It is a privilege and not a right. U.S. ex rel Gardner v. Madden, 352 F.2d 792 (9th Cir. 1965). HN2↑ 28 U.S.C. § 1915(e) vests the court with broad discretion to appoint counsel for an indigent **[*2]** in a civil action where the circumstances would properly justify it. Tabron v. Grace, 6 F.3d 147, 153 (3d Cir. 1993); Ray v. Robinson, supra at 477, citing Peterson v. Nadler, 452 F.2d 754 (8th Cir. 1971). Our Court of Appeals has stated that HN3↑ a request for appointment of counsel "is usually only granted upon a showing of special circumstances indicating the likelihood of substantial prejudice to him resulting, for example, from his probable inability without such assistance to present the facts and legal issues to the court is a complex but meritorious case". Smith-Bey v. Petsock, 741 F.2d 22, 26 (3d Cir. 1984).

Our Court of Appeals has recently elaborated on the "special circumstances" under which counsel may be appointed. Tabron, supra. As a threshold matter, the district court must consider the merits of plaintiffs claim. Id. 6 F.3d at 155. If the district court determines that the claim has an arguable basis in law and fact, it should consider a number of other factors. Id. These include the following: the plaintiff's ability to present his case taking into account plaintiff's education, literacy and prior litigation experience; the difficulty of the particular **[*3]** legal issues; the degree to which factual investigation will be required and the ability

of the indigent plaintiff to conduct such investigation; the amount of discovery required and the degree to which the case is likely to turn on credibility determinations. Id. at 156-57. The Court of Appeals also stated that it was cognizant of the lack of funding to pay counsel and the limited supply of competent lawyers willing to accept such appointments. Id.

We do not believe that this case presents circumstances requiring appointment of counsel. There is no involved investigation to be done by plaintiff, nor evidence to be obtained. At trial, plaintiffs will merely tell their stories to the jury. They may call any witnesses they wish. Of course, plaintiffs and there witnesses will be subject to cross-examination. However, plaintiffs may rest assured that, given their pro se status, the court will afford them every leniency it may within the confines of the Federal Rules of Civil Procedure and Evidence. If plaintiffs can demonstrate to the court at any time in the future that counsel should be appointed, the court will certainly reconsider plaintiffs' request.

The motion of plaintiffs **[*4]** to extend time to serve defendants is DENIED AS MOOT.

IT IS SO ORDERED.

CHARLES R. WEINER

Source: Legal > Cases - U.S. > District & State Courts - By State > **PA Federal District and State Courts** ⓘ
Terms: **diaconu and date(geq (01/01/96) and leq (12/31/02))** (Edit Search)
View: Full
Date/Time: Tuesday, February 25, 2003 - 10:32 AM EST

About LexisNexis | Terms and Conditions

Copyright © 2003 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

Not Reported in F.Supp.
1996 WL 665504 (E.D.Pa.)
(Cite as: 1996 WL 665504 (E.D.Pa.))

Page 1

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.
Eufrosina **DIACONU**
v.
William J. **PERRY**, Secretary of Defense.
**CIV. A. No. 96-0214.**

Nov. 8, 1996.
Eufrosina Diaconu, Philadelphia, PA, Pro Se.

Stephen J. Britt, U.S. Atty's Office, James G. Sheehan, Asst. U.S. Atty.-Civ.Div., Philadelphia, PA, for William J. Perry.

*MEMORANDUM*

BARTLE, District Judge.

**\*1** Plaintiff Eufrosina Diaconu ("Diaconu"), a former environmental engineer for the Defense Logistics Agency ("DLA"), brings this action for employment discrimination and retaliation against William Perry, the Secretary of Defense, as head of that agency. She claims that the government illegally dismissed her on May 5, 1995. The defendant now moves for summary judgment under Rule 56 of the Federal Rules of Civil Procedure on the six remaining counts of the complaint. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In those six counts Diaconu avers the following claims: (1) national origin discrimination under 42 U.S.C. § § 2000e *et seq.* ("Title VII"); (2) age discrimination in violation of the Age Discrimination in Employment Act ("ADEA") contained in 29 U.S.C. § § 621 *et seq.*; (3) sexual discrimination and harassment under Title VII; (4) retaliation for activity protected by Title VII; (5) intentional interference with advantageous contractual relations; and (6) retaliation for disclosures protected under the Whistleblower Protection Act, 5 U.S.C. § 2302(b)(8).

In a motion for summary judgment, the parties may not rest solely on their pleadings, but must produce evidence to demonstrate the presence or absence of a genuine issue of material fact. *Roa v. City of Bethlehem*, 782 F.Supp. 1008, 1014 (E.D.Pa.1991). According to Rule 56 the evidence produced shall be

[s]upporting and opposing affidavits ... made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith.

Fed.R.Civ.P. 56(e). Since Diaconu bears the burden of proof on issues which are the subject of the summary judgment motion, she must "identify evidence of record sufficient to establish every element essential to the claim." *Roa*, 782 F.Supp. at 1014. Although Diaconu is pro se, her response to the summary judgment motion as well as her compliance with other Federal Rules of Civil Procedure demonstrate that she has a high level of sophistication about legal matters.

Because Diaconu was a federal employee, she must follow the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1996 WL 665504 (E.D.Pa.)
(Cite as: 1996 WL 665504 (E.D.Pa.))

procedures prescribed in the Civil Service Reform Act of 1978 ("CSRA"), 5 U.S.C. § § 7511 *et seq.,* which was enacted to ensure that federal personnel decisions are merit-based. *Broughton v. Courtney,* 861 F.2d 639, 641 (11th Cir.1988). Before an adverse employment action such as removal may take place, a federal employee is entitled to thirty days advance written notice of the specific reasons for the proposed action, and to a reasonable time to answer the allegations. 5 U.S.C. § 7513. The aggrieved party has a right to be represented by an attorney and must be advised in writing of the ultimate employment decision and the reasons supporting the decision. *Id.* An employee may appeal any adverse decision to the Merit Systems Protection Board ("MSPB"). *Id.;* 5 U.S.C. § 7701. After an MSPB decides the appeal, the employee may seek relief in the appropriate district court. [FN1] *Mason v. Frank,* 32 F.3d 315, 317 (8th Cir.1994). Discrimination claims may be reviewed by the district court de novo. *Id.;* 5 U.S.C. § 7703(c). However, review of nondiscrimination claims is limited to the administrative record. *Mason,* 32 F.3d at 318; 5 U.S.C. § 7703(c).

> FN1. Pursuant to 5 U.S.C. § 7703(b)(1), the Federal Circuit has exclusive jurisdiction over an appeal of the MSPB decision. However, when the MSPB decision involved claims of discrimination, a district court has jurisdiction to review the claims of discrimination as well as the non-discrimination claims. *Williams v. Rice,* 983 F.2d 177, 180 (10th Cir.1993).

*2 Diaconu worked for the DLA as an environmental engineer from August, 1985 until May 5, 1995. While she initially worked in the California office, she was relocated to Philadelphia in July, 1990. Her job was to monitor the DLA's compliance with environmental laws and regulations.

It is undisputed that the government took disciplinary action against Diaconu on three separate occasions prior to her termination. The most recent occurred on June 30, 1993. However, in her affidavit in opposition to the motion for summary judgment, Diaconu asserted that these disciplinary actions were in retaliation for her disclosures protected under the Whistleblower Protection Act. Such disclosures described the DLA's alleged corruption, waste, fraud, abuse of taxpayer's money, as well as its intentional health and environmental violations. In fact, on January 27, 1993, Diaconu served DLA with a 60 day notice of intent to file a citizen lawsuit, based upon her belief that the DLA was in noncompliance with environmental regulations. Diaconu eventually filed the lawsuit on December 2, 1994 in the United States District Court for the Eastern District of Pennsylvania. [FN2]

> FN2. The lawsuit was dismissed on May 22, 1995 on defendants' unopposed motion to dismiss.

These three disciplinary actions, however, all occurred before the arrival of the supervisors responsible for Diaconu's dismissal. The government's affidavits revealed that John Bravo ("Bravo") did not become Diaconu's immediate supervisor until August, 1993 and her "second line supervisor" until October, 1993. It was not until Bravo

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1996 WL 665504 (E.D.Pa.)
(Cite as: 1996 WL 665504 (E.D.Pa.))

was promoted that William Stem ("Stem") assumed the position of Diaconu's immediate supervisor. Although Bravo was aware that Diaconu had problems with prior supervisors, he also noted problems in her performance such as a tendency to investigate "peripheral issues which were not pertinent to her assigned tasks." He was also concerned over her lack of cooperation with others, and her tendency to create, rather than alleviate, office tension. In his affidavit, Stem stated that Diaconu exhibited rude and unacceptable behavior in the office. In an inter-office memorandum dated March 1, 1994, he warned Diaconu that such behavior would not be tolerated.

On November 22, 1994, Bravo gave Diaconu a memorandum which requested her to follow-up on some of her prior work. Diaconu refused to accept the work request and stated that her immediate supervisor, Stem, told her not to take any orders from Bravo. She also refused the work on the grounds that she lacked the proper expertise. Bravo informed her that the task required only information gathering, and that no expertise was necessary. Diaconu left Bravo's office without the memorandum and never completed the assignment. Bravo documented this incident in a memorandum to Stem. When confronted by Bravo, Stem denied ever telling Diaconu she could not accept work from Bravo.

According to Diaconu's affidavit, she did not refuse Bravo's direct request to do work. Rather, she began working on the issue requested, but later stopped this work at the request of both Bravo and Stem. However, Diaconu then stated that "[b]y not accepting work directly from Mr. Bravo when Mr. Stem already assigned me work prior taken off [sic], I followed the instruction received from my direct supervisor who was Mr. Stem, and not Mr. Bravo." This contradicts her earlier assertion that she did not refuse Mr. Bravo's work request.

**\*3** According to the government's affidavits, around January 6, 1995, Stem ordered Diaconu to write a statement of work, or SOW, necessary for the clean up of a factory. This description would then form the basis for a clean-up contract. Stem declared that Diaconu was rude and discourteous to the base contracting staff with whom she was to work on preparation of the SOW. Such staff requested a more detailed description from Diaconu, but she refused to comply. The contracting staff complained to Stem that Diaconu was rude and they stated that they no longer wanted to work with her. According to Stem, Diaconu never completed this assignment.

Diaconu responded in her affidavit that Stem did not and could not, due to government procedures in closing a site, request an SOW. Diaconu contended that she was assigned to other matters and attached as an exhibit her weekly work summary, called an Activity Report, which does not show the above-mentioned assignment. Diaconu stated that she was assigned to and completed a cleanup work plan for the two relevant sites on January 10, 1995. Whether this is the same assignment that the government calls an "SOW" is unclear. In her affidavit, Diaconu did not deny that she was pushy or rude to base contracting staff. Rather, she related that her duties did not require her to have direct contact with such staff. She

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1996 WL 665504 (E.D.Pa.)
(Cite as: 1996 WL 665504 (E.D.Pa.))

further noted that the declarations of two contracting employees, Deborah Lombardi and Frank Holder, did not use in the agency hearing before the MSPB, did not accuse her of such rude conduct, nor did the declarations state that they refused to work with her. A review of these declarations, attached by Diaconu as exhibits, corroborates this statement. However, the declarations confirmed that the contracting employees never received an adequate SOW from Diaconu, even though it was directly requested. Instead, another engineer completed the statement.

The government's affidavits next commented that Diaconu was assigned responsibility for the National Environmental Policy Act ("NEPA") compliance program. However, to expedite the matter, Stem assigned one NEPA issue to another employee, who had familiarity and previous experience with the issue. Thereafter, on January 12, 1995, when Stem gave Diaconu a different NEPA project, she loudly and rudely refused to accept it because of Stem's prior assignment of a NEPA issue to another employee. Diaconu never completed the NEPA project assigned to her on January 12, 1995. In her affidavit, Diaconu denied knowledge of this incident. She noted that according to her Activity Report for the week ending January 13, 1995, she was very busy.

The government next described an incident that occurred around January 19, 1995 when gasoline, a hazardous material, spilled at Diaconu's work installation. A Hazardous Spill Response Team, specially trained for such hazardous situations, responded. According to the government, the team members were the only personnel to be in the hazardous area. Although the government previously offered to train Diaconu to become a member of this team, she had declined. Despite not being a member of this team, she went to the spill site and interfered by questioning the actions taken by the On-Scene Commander. She was not wearing the required protective clothing and refused to leave the scene when ordered to do so. Diaconu touched the gas on the ground with her bare hands and then smelled the substance on her hand. She also threatened the On-Scene Commander with a written derogatory report of his handling of the matter. The government's version of this incident is confirmed in a January 20, 1995 report by the On-Scene Commander, Farhad Tehrani, which is appended to Bravo's affidavit.

*4 Diaconu's affidavit disputed the government's allegations. She contended that she was just outside the hazardous "cordoned off" area and therefore she was not interfering and was not required to wear protective gear. Moreover, Diaconu stated that at the time of this incident no safety regulations existed. Therefore, in failing to wear protective gear she could not have violated any safety regulations. She maintained that she requested the training necessary to become a member of the Hazardous Spill Response Team, but Bravo denied her request.

Finally, the government declared that Diaconu called Stem, a "male, chauvinist pig" loudly and in the presence of other employees during a presentation of performance awards on January 25, 1995. Diaconu's affidavit countered that an award was given to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1996 WL 665504 (E.D.Pa.)
(Cite as: 1996 WL 665504 (E.D.Pa.))

another employee, Mr. Miller, for work that she performed. She further claimed that it was after the meeting, in Stem's office and not in front of other employees, that a confrontation occurred. In Stem's office, she asked why Mr. Miller received an award for work that she had accomplished. According to Diaconu, Stem laughed and responded, "I knew this award will make you tick, it will raised [sic] your adrenaline. What are going to do about it? Go ahead, file any complaint: administrative or EEO, sue me if you want, I really don't care because you are history anyway. What are you going to complain about it, I know I am a male pig chauvinist [sic]." Diaconu was upset and ran out of the office in tears. As she was leaving the office she repeated Stem's term "male, chauvinist pig." Diaconu stated that Mr. Bell, another employee whose desk was only two to three feet from Stem's office, was the only person who could have heard her repetition of Stem's statement. Neither the government nor Diaconu supplied an affidavit from Mr. Bell.

Subsequent to the above incidents, Stem and Bravo corroborated them with other employees, reviewed Diaconu's prior record of discipline and counseling, and consulted with Human Resources to ensure the penalty of removal was consistent with their regulations and past practices. Stem then prepared a Notice of Proposed Removal ("NOPR") based upon the offenses of insubordination and defiance of constituted authority, breach of safety regulations and practice, and rude and discourteous conduct. A copy of the NOPR was sent to Diaconu. Bravo, Stem's immediate supervisor, then reviewed this NOPR, and considered the response of Diaconu's attorney to the NOPR. Bravo agreed that Diaconu should be removed from her position. In reaching his decision, Bravo considered Diaconu's work performance, dependability, work habits, attendance record, and the seriousness of the current charges and their supporting evidence. He was particularly concerned that four incidents occurred within one month and that prior disciplinary actions and warnings had had no effect on her behavior. Bravo issued a Notice of Decision to remove Diaconu on May 5, 1995. Both Stem and Bravo denied that any decision was based on national origin, age, or sex.

*5 On May 15, 1995, Diaconu appealed her removal to the MSPB. After a hearing before Administrative Law Judge Fishman ("ALJ") on August 17 and August 21, 1995, the Board affirmed Diaconu's firing. It found that the agency's post-1993 charges were supported by a preponderance of the evidence. Moreover, the ALJ held that: (1) Diaconu failed to establish that the agency discriminated against her based on race, age, sex, or national origin; (2) Diaconu failed to prove mental handicap discrimination; and (3) Diaconu did not show by a preponderance of the evidence that any "whistleblower" disclosures she made contributed to her firing. The ALJ found Diaconu's testimony "not to be as straight forward, as convincing or accurate as that of Mr. Bravo." He found that Diaconu "has failed to provide corroborating evidence that Mr. Bravo told [her] that he would fire her because of her whistleblowing activities."

In an affidavit, Diaconu questioned the MSPB decision. According to Diaconu,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1996 WL 665504 (E.D.Pa.)
(Cite as: 1996 WL 665504 (E.D.Pa.))

the ALJ held a pre-conference meeting during which he indicated that he would not rule upon any of the disciplinary actions taken by the agency prior to her discharge on May 5, 1995. Yet, she asserted that in his opinion these charges were reviewed and found to have merit. Moreover, the ALJ allowed Bravo and Stem to refer to prior disciplinary actions which occurred even before they were Diaconu's supervisors. Diaconu's counsel objected to these references, but he was overruled. She also disputed the ALJ's finding that witnesses corroborated the government's version of events. In her affidavit, she declared that the witnesses' testimony actually corroborated her version and that Stem was unable to recall specifics at the hearing. Diaconu also maintained that some agency witnesses, specifically Deborah Lombardi and "M. Taylor," repeatedly changed their testimony. [FN3] According to Diaconu, the ALJ dismissed Deborah Lombardi from the hearing due to her apparent "confusion" about the events in issue. Diaconu stated further that she was only allowed to give "yes" or "no" answers while all other witnesses were allowed to fully elaborate on their responses. She was "stunned" when she received the ALJ's decision, based upon the "poor" and "contradictory" testimony which she believed failed to corroborate the reasons for her dismissal. Finally, Diaconu noted in her affidavit that at the last informal conference with the ALJ, he "expressed his concern" about ruling in her favor, because it was apparent that she was no longer wanted at the DLA. Diaconu did not state the date of this conference.

FN3. We do not know who Taylor

is or his relation to the events in issue. Ms. Lombardi had given a declaration relating to the contracting incident where plaintiff was accused of being rude to contracting employees.

Diaconu avers that the above disciplinary actions were acts of discrimination based upon national origin, age, and gender as well as retaliation for filing EEO complaints and making disclosures protected by the Whistleblower Protection Act. Diaconu contends that the harassment, discrimination and retaliation she endured caused her health to suffer. In a letter, her doctor confirmed that she shows signs of anxiety and stress attacks, including essential tremors throughout her body especially her hands, and that this condition is "psychological/emotional" and from "work stress/anxiety."

*6 A prima facie case of discrimination under Title VII and the ADEA [FN4] requires the plaintiff to show that: (1) she was a member of a protected class; (2) she was qualified for the position; (3) an adverse employment action was taken against her and; (4) other employees not in a protected class were treated more favorably. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973); *Josey v. John R. Hollingsworth Corp.,* 996 F.2d 632, 638 (3d Cir.1993). Plaintiff bears the burden of persuasion to establish the prima facie case. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252-53 (1981); *McDonnell,* 411 U.S. at 802. If she is able to meet this prima facie case requirement, a presumption of discrimination arises and the defendant has the burden of

Not Reported in F.Supp.
1996 WL 665504 (E.D.Pa.)
(Cite as: 1996 WL 665504 (E.D.Pa.))

producing evidence that it had a legitimate, nondiscriminatory reason for its actions. *Burdine,* 450 U.S. at 254; *McDonnell,* 411 U.S. at 803. If defendant produces such a reason, the burden then shifts back to plaintiff to prove pretext, that is, that the legitimate nondiscriminatory reason proffered by the employer was not the true reason for the employment decision but that the illegitimate reason was a determinative factor in the discharge. *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir.1994). At all times the burden of proof remains with the plaintiff. *Id.* at 763.

> FN4. The analysis and evidentiary burdens utilized in Title VII cases are to be applied to ADEA cases when possible. *Armbruster v. Unisys Corp.,* 32 F.3d 768, 777 n. 10 (3d Cir.1994). Under the ADEA, a member of the protected class is a person the age of 40 or older. 29 U.S.C. § 631.

The Third Circuit recently elaborated upon the showing necessary for a plaintiff to rebut defendant's legitimate nondiscriminatory reasons and to survive summary judgment. A plaintiff may either " (i) discredit[ ] the proffered reasons, either circumstantially or directly, or (ii) adduc[e] evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Fuentes,* 32 F.3d at 764. In order to discredit an employer's reasons, the plaintiff must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder

could rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.' " *Id.* at 765 (emphasis in original). An employer's treatment of the employee, the timing of the employee's dismissal, and the defendant's credibility can raise an inference of pretext such that summary judgment is inappropriate. *Josey,* 996 F.2d at 639.

Because Diaconu contends that this is a mixed motives case, further elaboration on the standards under Title VII and the ADEA is necessary. If a plaintiff alleging discrimination is able to produce direct evidence of discriminatory animus in the adverse employment decision, then the defendant bears a greater burden and must prove that in the absence of the impermissible reason, its decision would have been the same. *Price Waterhouse v. Hopkins,* 490 U.S. 228, 244 (1989); *Starceski v. Westinghouse Elec. Corp,* 54 F.3d 1089, 1095-96 n. 4 (3d Cir.1995). The type of direct evidence necessary to impose this burden on the defendant is "conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude." *Griffiths v. CIGNA Corp.,* 988 F.2d 457, 470 (3d Cir.), *cert. denied,* 510 U.S. 865 (1993), *overruled on other grounds by Miller v. CIGNA, Corp.,* 47 F.3d 586 (3d Cir.1995). Stray remarks, remarks by nondecisionmakers, or remarks unrelated to the decision process are not sufficient to constitute direct evidence. *Starceski,* 54 F.3d at 1096.

*7 Diaconu first alleges that the government discriminated against her

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1996 WL 665504 (E.D.Pa.)
(Cite as: 1996 WL 665504 (E.D.Pa.))

Page 8

because of her national origin in violation of Title VII. We review the MSPB's determination regarding discrimination de novo. 5 U.S.C. § 7703(c). Upon such a review, we find that Diaconu is unable to maintain even a prima facie case of national origin discrimination. Although she alleged in her complaint that she was Rumanian, she failed to state her nationality in her affidavits. Moreover, Diaconu has presented not a shred of evidence to show that persons not of Rumanian origin were treated more favorably. Mere conclusory allegations in the complaint are not sufficient to establish an inference of discrimination. *Cameron v. West,* No. C 95-1502, 1996 WL 524367, at *6 (N.D.Cal. Aug. 20, 1996); *accord Jurado v. Eleven-Fifty Corp.,* 813 F.2d 1406, 1409 (9th Cir.1987). In sum, she has not met the elements of a prima facie case required under the *McDonnell* pretext analysis. Because there is not even a prima facie case of discriminatory animus based on Diaconu's national origin, the mixed motive analysis does not apply. *Price Waterhouse,* 490 U.S. at 244.

Diaconu also presents a claim for age discrimination under the ADEA. We find that she failed to meet her obligation to state a prima facie case of age discrimination. Diaconu, as a person of at least the age of forty, is a member of the class of persons protected under the ADEA. 29 U.S.C. § 631. However, Diaconu presents no evidence that after her dismissal she was replaced by a younger employee. The only evidence about the factor of age was contained in the March, 1994 affidavit of Edgar Berzins, a general engineer with the DLA. That affidavit is dated some 14 months before she was

dismissed. Berzins stated that a younger female, Justina Wesley, was given the job of environmental engineer, which Diaconu had been performing. [FN5] Even if Diaconu were replaced or her duties assumed by a younger employee, under *Lawrence v. National Westminster Bank New Jersey,* No. 95-5603, 1996 WL 589189 at *2 (3d Cir. Oct. 15, 1996), plaintiff must demonstrate that her replacement was "sufficiently younger to permit a reasonable inference of age discrimination." Diaconu has not told us whether Wesley was her junior by a day or by twenty years, or somewhere in between. In short, Diaconu has not met the elements of a prima facie case under the *McDonnell* pretext model. Moreover, the events described in Berzins' affidavit related to events prior to the arrival of Bravo and Stem, the two persons that Diaconu contends precipitated her dismissal. Again, because there is no direct evidence of discriminatory animus based on the age of Diaconu, the mixed motives analysis of *Price Waterhouse* does not apply. *Price Waterhouse,* 490 U.S. at 244.

> FN5. Mr. Berzins stated "[r]egarding age, there was a position which was filled by a younger woman even though Ms. Diaconu had already assumed the duties and responsibilities of the position. The position was that of Environmental Engineer and it was filled by Ms. Wesley."

Diaconu also alleged that the government discriminated against her because of her sex, which is prohibited under Title VII. We find that there is a genuine issue of material fact which precludes summary judgment on this

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1996 WL 665504 (E.D.Pa.)
(Cite as: 1996 WL 665504 (E.D.Pa.))

claim. According to Diaconu, her immediate supervisor, Stem, discriminated against her by giving an award to a male employee for work she performed. Moreover, during an altercation in Stem's office, he allegedly referred to himself as a "male, chauvinist pig" and told Diaconu "you are history anyway." Conversely, Stem declared that it was Diaconu who called him a "male, chauvinist pig" during an award presentation and that this incident was part of Diaconu's ongoing rude and discourteous conduct which formed the basis for her dismissal. Determining whose version is correct will involve credibility determinations, which are for the jury, and not this court, to resolve. *Torre v. Casio, Inc.*, 42 F.3d 825, 835 (3d Cir.1994); *Coolspring Stone Supply, Inc. v. American States Life Ins. Co.*, 10 F.3d 144, 149 (3d Cir.1993). The court will defer until trial whether the pretext analysis of *McDonnell*, or the mixed motives model of *Price Waterhouse* applies. *Starceski*, 54 F.3d at 1095-98.

**\*8** To the extent that Diaconu raised issues of sexual harassment and retaliation for her filing of EEO complaints, we are precluded from review based on a lack of subject matter jurisdiction. The opinion of the ALJ reflected that Diaconu did not present the issues of sexual harassment or retaliation at the MSPB hearing. In order for this court to retain jurisdiction over Diaconu's allegations of federal employment discrimination, Diaconu must have fully exhausted her administrative remedies. *Williams v. Rice*, 983 F.2d 177, 180 (10th Cir.1993). Because she failed to raise these issues before the ALJ, she is precluded from raising them now before this court. *Id.*

Diaconu's eighth count, alleging intentional interference with advantageous contractual relations, also remains in this action. In Diaconu's complaint, she alleged that Bravo, Stem, Farhad Tehrani and Frank Holder "knew or should have known of the oral contract of employment" between Diaconu and the government, created when she relocated from California to Pennsylvania. She further stated that they interfered with this contract by causing DLA to terminate her employment. It is unclear from Diaconu's complaint whether she is alleging a violation of § 766 or § 766A of the Restatement (Second) of Torts. Therefore, we will address both sections. Section 766, entitled "Intentional Interference with Performance of Contract by Third Person" states:

> [o]ne who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

> Restatement (Second) of Torts § 766.

The only defendant now in this case is William Perry, as Secretary of Defense. Since any contract was between Diaconu and the DLA, as an agency of the government, any claim by Diaconu is quite limited. Even assuming she can sue under state law, there is no cause of action for tortious interference against a party to the contract in question. *O'Neill v. ARA Serv., Inc.*, 457 F.Supp. 182, 188 (E.D.Pa.1978). Moreover, an individual executive of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1996 WL 665504 (E.D.Pa.)
(Cite as: 1996 WL 665504 (E.D.Pa.))

contracting party is also not liable unless his or her sole motive in causing the breach was "actual malice directed toward the plaintiff," or if the executive was acting for his or her own personal interests and not those of the contracting party. *Avins v. Moll, 610 F.Supp. 308, 318 (E.D.Pa.1984), aff'd, 774 F.2d 1150 (3d Cir.1985); O'Neill, 457 F.Supp. at 188.* Diaconu presents no evidence that defendant acted with malice or in his own interest. To the extent that Diaconu has a claim against Bravo, Stem, Farhad Tehrani and Frank Holder, they are no longer defendants. Even if they were we would decline to exercise our supplemental jurisdiction, 28 U.S.C. § 1367, to hear this claim.

**\*9** Similarly, Diaconu's claim under the Restatement (Second) of Torts § 766A also fails. Section 766A states:

[o]ne who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person, by preventing the other from performing the contract or causing his performance to be more expensive or burdensome, is subject to liability to the other for the pecuniary loss resulting to him.

Restatement (Second) of Torts § 766A. Pennsylvania has not yet adopted this section of the Restatement. *GE Capital Mortgage Serv., Inc. v. Pinnacle Mortgage Inv. Corp., 897 F.Supp. 854, 869 (E.D.Pa.1995).* Even if § 766A constituted Pennsylvania law, Diaconu's claim fails for the reasons stated above in the discussion regarding § 766.

Diaconu's final count alleged that her discharge was in retaliation for her disclosures protected under the Whistleblower Protection Act. *See 5 U.S.C. § 2302(b)(8).* Our review of this claim is very limited. According to the statute, 5 U.S.C. § 7703(c), a nondiscrimination claim must be reviewed on the administrative record alone. *Mason v. Frank, 32 F.3d 315, 317 (8th Cir.1994).* An MSPB decision may only be set aside if: "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence." 5 U.S.C. § 7703(c). Because of this narrow scope of review, credibility determinations by the Board/ALJ are essentially unreviewable. *Hambsch v. Department of Treasury, 796 F.2d 430, 436 (Fed.Cir.1986).* To date we have not received the administrative record, but we expect it shortly. We will therefore defer decision on this count while we await the transcription of the MSPB hearing.

In conclusion, the government's motion for summary judgment will be granted in part and denied in part. Summary judgment will be granted in favor of defendant William Perry, Secretary of Defense, and against plaintiff Eufrosina Diaconu, on her counts of national origin discrimination, age discrimination, retaliation for protected activity and intentional interference with advantageous contractual relations. The government's motion for summary judgment on Diaconu's claim of sex discrimination will be denied. Our decision whether or not to grant summary judgment on Diaconu's whistleblower count is deferred.

*ORDER*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1996 WL 665504 (E.D.Pa.)
(Cite as: 1996 WL 665504 (E.D.Pa.))

Page 11

AND NOW, this 8th day of November, 1996, for the reasons set forth in the accompanying Memorandum, it is hereby ORDERED that the motion of defendant for summary judgment is GRANTED in part and DENIED and that:

(1) Judgment is entered in favor of defendant William J. Perry, the Secretary of Defense, and against plaintiff Eufrosina Diaconu on the claims of national origin discrimination, age discrimination, retaliation for activity protected by 42 U.S.C. § § 2000e *et seq.,* and intentional interference with advantageous contractual relations.

**\*10** (2) Summary judgment as to plaintiff's claim for sex discrimination is DENIED.

(3) Decision is reserved on defendant's motion for summary judgment on the claimed violation of the Whistleblower Protection Act until the transcript from the hearing before the Merit Systems Protection Board is received.

1996 WL 665504 (E.D.Pa.)

**Motions, Pleadings and Filings (Back to top)**

.       2:96CV00214          (Docket) (Jan. 11, 1996)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**F I L E D**

EUFROSINA DIACONU                                    CIVIL ACTION

- v.                         NOV 2⁄1 1996

WILLIAM PERRY,              MICHAEL E. KUNZ, Clerk
SECRETARY OF DEFENSE        By _____ Dep. Clerk   96-0214

VERDICT SHEET

1.   Do you find that Eufrosina Diaconu's gender was a determinative factor in her discharge from the Defense Logistics Agency?

YES _____              NO ✔ _____

If you answered, "no" proceed no further.  If you answered "yes," proceed to question number 2.

2.   What is the amount of damages to which Eufrosina Diaconu is entitled against William Perry, Secretary of Defense, as head of the Defense Logistics Agency?

$_____

_____
Foreperson

DATED:  November 2⁄1 , 1996

EXHIB. #4

# EXHIBIT G

**<u>Diaconu v. Gates, et al.</u>**
**Civil Action No. 07-1358 (EGS)**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **EUFROSINA DIACONU,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | **Civil Action No. 07-1358 (EGS)** |
| **v.** | ) | |
| | ) | |
| **ROBERT GATES, Secretary of Defense;** | ) | |
| **U.S. DEPARTMENT OF DEFENSE;** | ) | |
| **and STEVE JOHNSTON,** | ) | |
| **Administrator, U.S. Environmental** | ) | |
| **Protection Agency,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## DECLARATION OF EDYTA CZERNIAK

I, Edyta Czerniak, do make the following declarations:

1. I am the claims adjudicator for the Ft. Dix Claims Office. This office adjudicates Federal Tort Claims Act (FTCA) claims filed against components of the United States Army and other Department of Defense components.

2. The Ft. Dix Claims Office received Ms. Eufrosina Diaconu's administrative tort claim dated, May 14, 2007, from DSC Philadelphia on 3 Jan 2008.

3. I have searched our computer databases, which lists claims back to 1989. To my knowledge, the attached claim is the only administrative tort claim submitted by Ms. Diaconu to the Defense Supply Center Philadelphia (a component of the Defense Logistics Agency, which is part of the Department of Defense) and forwarded to the Fort Dix Claims Office.

4. To date, no disposition has been made of Ms. Diaconu's claim.

I declare under penalty of perjury that the foregoing declarations are true and correct to the best of my knowledge.

DATE 3 Jan 2008

EDYTA CZERNIAK Claims Adjudicator
Fort Dix Installation Legal Office