IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | |
|---|---|
| EUFROSINA DIACONU,<br>   Plaintiff/Class Agent, Pro Se<br><br>v.<br><br>ROBERT GATES,<br>   Secretary of Defense.<br>U.S. Department of Defense<br>       and<br>STEVE JOHNSTON,<br>   Administrator.<br>U.S. Environmental Protection Agency<br>       Defendants. | TOXIC TORT & MALPRACTICE<br><br>CLASS ACTION<br><br>Case No. 07-1358 (EGS)<br><br>**RECEIVED**<br>FEB - 7 2008<br>NANCY MAYER WHITTINGTON, CLERK<br>U.S. DISTRICT COURT |

BY CERTIFIED MAIL 7006 2150 0002 5308 7231

**PLAINTIFF/CLASS AGENT'S RESPONSE IN OPPOSITION TO
DEFENDANT'S REQUEST TO DENY CONTINUATION**

Dated 01/29/08 on 02/02/08 plaintiff/class agent, pro se received defendant's OPPOSITION TO PLAINTIFF'S MOTION FOR CONTINUATION. While citing several motions in opposition to every motion filed so far by the pro se plaintiff/class agent, the U.S. Department of Justice ("DOJ") who represents defendant DoD & defendant EPA, finally admitted that in their response to the complaint, MOTION TO DISMISS-Docket Nr.6, "... the United States has not denied the claims..."| emphasis added|. THEREFORE, defendant DoD & defendant EPA has admitted full toxic tort and malpractice liability to plaintiff and to the members of the class. YET, the DOJ has requested the case be dismissed on two false, unlawfull and groundless reasons: (1) plaintiff's "character" deriving from her previous cases filed pro se against the two defendants. (2) Presumedly, just because the DOJ said so, without citing the paragraph of the law, DOJ wants THIS court to believe that (i) this case does not meet the FTCA's administrative claim requirement. (ii) DOJ wants THIS court to believe that just

(

because the instant case was filed <u>pro se</u> by DIACONU, the case "may not" proceed as a class; in other words the DOJ tells AND TO THIS court what may and may NOT do. THUS, while admitting full toxic tort and malpractice liability to the plaintiff <u>pro se</u> and to the members of the class, defendant DoD and defendant EPA offers no relief neither to the plaintiff pro se nor to the members of the class. This admission coming from the defendants more than ever strongly supports the need for CONTINUATION until such a time THIS Court will appoint a counsel to represent the members of the class <u>AND</u> until such a time, whichever comes first, either THIS Court appoints a counsel to represent the <u>pro se</u> plaintiff OR defendant DoD & EPA actually monetarily compensates DIACONU for her irreversible total & permanent neurological disability and other health injuries so, she can afford to hire a toxic tort & malpractice lawyer. In order to help THIS court |emphasis added| with the decision of whether to appoint NOW a counsel to represent DIACONU or to wait until the Fort Dix actually monetarily compensates plaintiff according to her 05/14/07 CLAIM FOR DAMAGE, INJURY OR DEATH Std. Form 95 - DOJ Exhibit F and Exhibit G, by certified mail 7006 2150 0002 5308 7248, on 02/01/08 DIACONU sent to Ms. EDYTA CZERNIAK, Claims Adjudicator, Fort Dix Installation Legal Office, Fort Dix, New Jersey, the letter <u>EXHIBIT # 1</u>.

While a more comprehensive legal arguments against DOJ's position on the instant case will be prepared by the court's appointed counsel representing the members of the class and by a lawyer (appointed by THIS court or hired by DIACONU) representing the <u>pro se</u> plaintiff, at this time for the record DIACONU brings to THIS court's attention the following facts:

1. Plaintiff never denied that she filed four previous cases against defendants; to the contrary, she cited every single one of them - see Complaint @ VENUE.

2. All four previously filed cases by DIACONU: (a) were filed pro se; (b) have been filed in forma pauperis; (c) although the U.S. District Court For The Eastern District Of Pennsylvania knew

that DIACONU had an irreversible totally and permanent neurological disability, her requests for court appointed counsel have been denied; (d) all cases have been dismissed (i) before discovery (except the 98-0214) and (ii), before depositions have been taken, just to name few of the many technical errors committed during the life of those cases.

3. All four previously filed cases have been dismissed at the request of the U.S. Attorney's Office Philadelphia, DOJ, the same DOJ that requires now from THIS court to dismiss the instant case.

4. DEFENDANT'S MOTION TO DISMISS THE CASE is nothing but a "dossier" of DIACONU's exercising her federal employment rights as well as her civil rights.

5. Even if plaintiff would have been of bad character, still (i) does NOT justifies DOJ's request to dismiss the class, and (ii), still does NOT justfies DOJ's request to dismiss the instant case in mod particular when on their 01/29/08 motion admits full toxic tort and malpractice liability.

6. While a more comprehensive rebuttle to all DOJ's motions in general and the issue of FTCA's supposedly six months elapsed time in particular, will be provided in the future by the appointed counsel(s) at this time plaintiff, pro se wants to enter into the record the following.

(a) The NOTICE of intent to file a new class action toxic tort was filed on 03/13/07.

(b) Defendants had until 06/12/07 to respond to the NOTICE but, each one chose not to respond; THUS, waved any defense.

(c) The file record shows that the summon and complaint was served upon defendant DoD and defendant EPA on 10/31/07, seven months after each one received his own NOTICE. During the seven months period none of the defendants made any effort to contact DIACONU.

With the risk of repeating herself, DIACONU respectfully reminds this court (1) the DoD's field activity in Philadelphia where she was obligated to relocate it was a all civilian federal agency, and NOT a military training or ordinance/weapons/

3

nuclear/biological storage facility where someone could and should have expected exposure to ultrahazardous chemicals and/or materials. (2) The "FACTORY" where the illegal chemical plant activity took place and where most of the members of the class worked closed effective 09/30/1993. Most were let go, some forced to retire or they had no income. (3) The members of the class were/still are residents of the New Jersey, Delaware, Maryland and/or City of Philadelphia/surrounding of. (4) Most of the members of the class are dead or about to die. (5) Like DIACONU most of the members of the class no longer can claim FECA.

Based upon above, plaintiff/class agent prays that THIS court **will deny** DOJ's opposition expressed on 01/29/08 instead it WILL GRANT PLAINTIFF/CLASS AGENT'S MOTION FOR CONTINUATION as previuosly requested. THANK YOU !

Respectfully submitted,

Exhibit.

EUFROSINA DIACONU,
Plaintiff/Class Agent, Pro Se.
533 East Luray Street
Philadelphia, PA 19120

02-05-08

4

DIACONU v. DoD & U.S. EPA          Toxic Tort & Malpractice
                                    CLASS ACTION No. 07-01358 (EGS)


### CERTIFICATE OF SERVICE


The undersigning Plaintiff/Class Agent, <u>Pro Se</u> hereby certifies that a true and correct copy of the PLAINTIFF/CLASS AGENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S REQUEST TO DENY CONTINUATION with EXHIBIT # 1 containing a copy of the letter dtd. 02/01/08 addressed to Ms. EDYTA CZERNIAK, Claim Adjudicator Fort Dix was sent via first class U.S. Mail on this day of 02/05/08 to:

        DAVID S. FISHBACK,
          Assist. Director.
         Torts Branch (Environmental Torts)
         Civil Division
        United States Department of Justice
        1331 Pennsylvania Ave., NW, Suite 800 South
        Washington DC 20004

*[signatures]*

EUFROSINA DIACONU,
    Plaintiff/Class Agent, <u>Pro Se</u>.

                   **EUFROSINA DIACONU**
                   533 East Luray Street
                   Philadelphia, PA 19120


        DIACONU v. DoD & U.S. EPA
        a Pro Se Toxic Tort & Malpractice
        Class Action No. 07-01358 (EGS)


**EDYTA CZERNIAK,**
  Claims Adjudicator
Fort Dix Installation Legal Office
Delaware Avenue, Bldg. 5418              February 01, 2008
Fort Dix, NJ 08640


          BY CERTIFIED MAIL 7006 2150 0002 5308 7248

Dear Ms. Czerniak,

  THANK YOU for supporting the referenced pro se class action toxic tort & malpractice case by providing the U.S. Department of Justice ("DOJ") with your 01/03/2008 no non-sense and straight to the point DECLARATION. The DECLARATION not only that is part of the record file but, it plays a very important role.

  I am writing to you for two reasons. First, because I have just noticed that the DOJ's EXHIBIT # F which contains the CLAIM FOR DAMAGE, INJURY OR DEATH Std. Form 95 I filed with DoD on 05/14/2007 is incomplete. EXHIBIT # 2, Dr. Martin Pieretti's 05/15/2001 EVALUATION FOR TOXIC EXPOSURE is incomplete; it should have also included the 04/16/2001 NEUROPSYCHOLOGICAL EVALUATION conducted by Dr. TERRI MORRIS, PhD, ABPN, ACPN, Albert Einstein Medical Center, Philadelphia, PA. As ENCLOSURE I am sending you a copy of the missing neuropsychological evaluation. Since 2001 my irreversible neurological condition has worsen. Second reason why I am writing to you is f i n a n c i a l. Since December 1995 my only source of income is a small social security monthly benefit, the reason why I can not afford to hire a lawyer to represent me in the referenced toxic tort & malpractice class action case. I asked for a court appointed counsel but, the DOJ categorically opposed my request. I asked the court for a continuation of the case until either your office actually monetarily compensates me

as requested on 05/14/2007 CLAIM FOR DAMAGE AND INJURIES or the court appoints a counsel, whichever comes first.

Granted that you have just received my 2007 CLAIM because DoD sat on it from May 2007 until 01/03/2008, in order to satisfy the court & the DOJ I need to know exactly:

(i) what is the status of my claim ?

(ii) I need to know exactly when am I going to be actually monetarily compensated as requested ?

Your response should reach me on or before the closing day of **02/25/2008**.

Be advised that both: this letter and your response, will be introduce as evidence into the record of the referenced case. Also you should know that the instant case relates exclusively to my 2006 diagnosis of having cancer and has absolutely nothing to do with the irreversible total and permanent disability and other health injuries which are the subject of the claim before your office. Should you have any additional question please, feel free to put them in writing; I promise to respond to it to the best of my ability.

THANK YOU for your cooperation !

Sincerely yours,

*[signature]*
EUFROSINA DIACONU

Encl.



Albert Einstein Medical Center

*Jefferson Health System*

# NEUROPSYCHOLOGICAL EVALUATION

**Members**

- Albert Einstein
  Healthcare Network
    Albert Einstein
    Medical Center
    Belmont Behavioral
    Health
    Germantown
    Community Health
    Services
    MossRehab
    Willowcrest
    Willow Terrace
- Frankford Hospitals
    Bucks County
    Frankford
    Torresdale
- Main Line Health
    Bryn Mawr Hospital
    Bryn Mawr Rehab
    Lankenau Hospital
    Mid County Senior
    Services
    Paoli Memorial
    Hospital
    Wayne Center
- Magee Rehabilitation
- Thomas Jefferson
  University Hospital
    Methodist Hospital
    Methodist Hospital
    Nursing Center

Jefferson HealthCARE
physicians

Jefferson HomeCARE

Jefferson SeniorCARE

**Alliance Partners**

- AtlantiCare
- Christiana Care
  Health System
- Pottstown Memorial
  Medical Center
- Riddle Memorial
  Hospital
- Underwood-Memorial
  Hospital

ww.einstein.edu

Patient Name:      Eufrosina Diaconu
Age:               59 (DOB: 11-10-41)
Handedness:        Right
Education:         College Level (Civil Engineering)
Referral Source:   Dr. Terry Waldman
Evaluation Date:   April 16, 2001

## TESTS ADMINISTERED:

Wechsler Adult Intelligence Scale-Revised (WAIS-R):
    Performance Scale
    Information
    Comprehension
    Digit Span
Wide Range Achievement Test-Three (WRAT-3):
    Reading
    Arithmetic
Finger Tapping Test
Hand Dynamometer
Grooved Pegboard
Trails A and B
Reitan-Klove Sensory Perceptual Examination
Boston Naming Test
Phonological Naming (F-A-S)
Boston Diagnostic Aphasia Exam (BDAE):
    Animal Naming
Verbal and Nonverbal Cancellation Test
Rey Osterreith Complex Figure with Recall
Wechsler Memory Scale-Revised (WMS-R):
    Logical Memory I and II
    Visual Reproduction I and II
California Verbal Learning Test (CVLT)
Wisconsin Card Sorting Test

5501 Old York Road • Philadelphia, PA 19141

## BACKGROUND INFORMATION:

Eufrosina Diaconu is a 59 year old female, referred for neuropsychological evaluation by her primary physician to rule out cognitive deficits secondary to toxin exposure. The patient arrived on time for her appointment, and she brought copies of medical records/reports with her.

Ms. Diaconu gave her history as follows. She stated that she began working as a civil engineer technician for the Department of Defense, in Alameda California in 1985. She was in charge of maintenance and repairs at the base. In 1990, she was transferred to Philadelphia, where she was placed in environmental engineering, stating she had no experience in this area. She experienced stress and anxiety because of this relocation, and said she was diagnosed with "adjustment disorder". She noted that in 1992, she walked into a building in a part of the manufacturing plant, and smelled a "strong odor" when a plastic bag covering a large bail of cloth was opened. She said she was told this was formaldehyde. She went to the Personnel office that same morning, and said she "fainted". She did not go to a hospital, preferring to see her own doctor instead, who referred her to a psychiatrist. She said that some of the doctors she has seen have focussed on the anxiety and stress, and have de-emphasized other symptoms she has experienced, such as increasing problems with balance, a feeling of "choking" which is worse at night, and deterioration in her voice. She also stated that the base were she was working was found to be "contaminated".

The patient said she suffered another episode of fainting in February of 1993.

Ms. Diaconu is not currently employed, but is receiving SSI. She has not been able to return to work since 1995. She said she was advised to "have surgery on the brain to reduce the tremor", but she has refused this. She did report having inner ear surgery at Hahnemann Hospital in 1991.

Medical records were available for review. Dr. Apollo Arenas' evaluation of February 20, 1995, noted that the patient had claimed to having been exposed to a number of chemicals, including toluene, asbestos, benzine, and DDT. His report also noted the patient to have reported episodes of loss of consciousness, occurring when she was

very upset. She also complained of headaches, dizziness, and progressive weakness, as well as difficulty breathing. His neurologic exam revealed "prominent and coarse tremors in her hands bilaterally present with posture and during activity". Diagnostic impression was of "tremors, probably essential tremors. Rule out degenerative disease in the basal ganglia secondary to chemical exposure". MRI of the brain, EEG, thyroid function tests, urinalysis/heavy metal screen, and chest x-ray were recommended.

The patient had MRI of the brain in September of 1999, which found ". . . prominence of the ventricles and sulci suggestive of atrophy greater than expected for age. . .". Clinical impression was "mild atrophy greater than expected for age".

Dr. Arenas' recent evaluation of the patient (March, 2001) reported the patient to "continue to have severe vocal, truncal and extremity tremors which significantly affect her level of functioning. She has difficulty talking, writing, eating, and all other activities that involve good control of her extremities. She continues to refuse surgical intervention". Clinical impression was of "essential tremors. . . . She has been exposed to various chemicals at work, including chlorinated hydrocarbons, DDT, toluene, benzene, etc. These types of chemicals have been known to cause injury to the central nervous system that could cause dyskinesias or Parkinsonian signs and symptoms".

The patient underwent a voice evaluation in 1998 at Temple University Hospital, and the diagnostic impression was "moderate-severe dysarthria and dysphonia with a harsh, strained and tremorous vocal quality. . .". A voice therapy program was recommended.

Hepatic panel studies (Frankford Hospital) on August 17, 2000, showed and AST/SGOT level of 70 (range=10-40). Abdominal ultrasound of April 4, 2001 showed "increased hepatic echogenicity and gallstone".

Ms. Diaconu was born and raised in Romania. She immigrated to the United States in 1975. She took college courses in civil engineering in California, at UC-Davis and University of Southern California. She said she did not get her degree, and this is why she has been employed as a "technician". She currently lives alone, but

said her 87 year old father still visits her from Romania, for extended stays.

## TEST RESULTS:

**Behavioral Observations:** The patient was tested over the course of a day, in two sessions, with a one hour lunch break. She was cooperative but appeared anxious over how she performed on various tests, and often asked for feedback as to the correctness of her answers. She showed low motivation to continue on tasks if she perceived that she was doing poorly. In general, however, her motivation was adequate and she was able to complete the battery of tests.

The patient had good eye contact, and was dressed casually. She used a walker for ambulation; her walk appeared unsteady and slow. At times she leaned into her walker, almost losing her balance. She took small steps. Ms. Diaconu has a noticeable tremor (trunk, neck/head, and arms), at rest and during activity. Her voice is quite tremulous and her pace of speaking was necessarily slowed. Mood was normal range; affect was mildly anxious. There was no evidence of bizarre thought processes.

Test results are summarized by function.

**Orientation:** The patient was fully oriented to time, place and person. She was able to give her past medical and social history adequately, and was specific about times and dates of events. She stated her age, date of birth, her name, the year, month, date, weekday, city and hospital correctly. She was able to name the current and recent prior presidents.

**Attention:** The patient showed no signs of impersistence or unilateral neglect. She was generally able to maintain her attention to all tasks, and did not have to be redirected by the examiner. Cognitive slowness was evident on many tasks.

Digit Span was low average range, 6 forward recalled (normal), but only 4 backward recalled (borderline). Visual scanning (Trails A) and visuomotor speed (Digit Symbol) were mildly impaired secondary to slowness. Visual attention shifting (Trails B) was mildly

impaired due to slowness and loss of set. On a visual search task, the patient was mildly slow.

**Memory:** On the WMS-R, immediate verbal recall was impaired, at 27th percentile, compared to immediate visual recall, which was normal range at 50th percentile. After a 30-minute delay, the patient had normal retention rate: 94% verbal retention-48th percentile, and 97% visual retention-61st percentile.

Verbal list learning and recall (CVLT) were mildly impaired, with scores consistently at one standard deviation below the mean for age and gender. Acquisition (Trial 1), learning with practice (Trial 5), short delay and long delay recall (free and cued) were all impaired. Recognition memory (multiple choice format) was also impaired, at one standard deviation below the norm. The patient showed a tendency toward perseverative errors on this test.

Immediate and delayed recall of a complex figure (Rey) were mildly impaired.

**Language:** The patient showed no obvious problems with comprehension of spoken language. As her first language is German, testing of complex grammar was not done, to avoid possible cultural bias. She indicated that she began learning English after immigrating to the U.S. in 1975.

The patient's speech is notable for a marked tremulous quality and slowness. No dysarthria was noted in conversation, nor did the patient have word finding problems. She did not make grammatical errors when speaking.

The patient's performance was impaired on all tests of naming, including confrontation naming (greater than 3 standard deviations below the mean), categorical naming (two standard deviations below), and phonological naming (greater than two standard deviations below). Slowness and poor motivation contributed to lowering her performance on the latter tasks. Lack of familiarity (English) on the confrontation naming task cannot be ruled out; this may have resulted in an overdetermination of impairment.

**Spatial and Constructional Skills:** WAIS-R Performance I.Q. is 92 (average range). On subtests of visual detail analysis, visual

sequencing, and arranging blocks to match a model, scale scores were average range. Assembling puzzles and copying symbols were in the low average range.

The patient's ability to copy a complex figure (Rey) was clearly affected by her motor tremor; if this is accounted for in scoring, her copy of the design from a spatial standpoint is normal range (50th percentile or better).

**Verbal Intellectual and Academic Skills:** Reading and written arithmetic (WRAT-3) were both average range, at 50th percentile or better, and at post high school level.

Factual knowledge (WAIS-R Information subtest) was in the high average range. Verbal problem solving (Comprehension) was low average.

**Sensory-Perceptual and Motor Skills:** The patient is right hand dominant. Her grip strength was normal range, with the expected differential between the dominant and nondominant hands.

Motor speed (tapping) was severely impaired for each hand, with particular slowness noted for the left hand. Similarly, fine dexterity (pegboard) was severely impaired, bilaterally, worse for the left hand.

Performance was normal range on the Sensory-Perceputal Exam. The patient had full visual fields, and no visual imperceptions nor suppressions. Tactile perception was normal for light touch, with no imperceptions nor suppressions. Finger gnosis and graphesthesis were also normal range. Auditory suppression testing was invalid due to the patient's report of surgery on the left ear/cotton in the left ear at the time of testing.

**Executive Functions:** The patient was impaired on tests of mental flexibility and novel problem solving, showing particular problems with sustaining and changing cognitive set. This was evident on a card sorting task (very low number of correct categories sorted; numerous failures to maintain set) and on a visual set shifting task (slowness and set maintenance errors). On verbal and visual tasks that required planning, organization, and strategy, her scores were low relative to performance on more structured tasks in these domains.

## SUMMARY:

The profile is abnormal, with deficits summarized as follows:

1. Mild cognitive slowness on visual scanning, tracking, and search tasks.

2. Mild impairment in immediate verbal memory (registration); retention over a delay was normal range. Impaired verbal list learning, recall and recognition (mild). Mildly impaired complex visual memory.

3. Mild impairment in naming.

4. Severe motor slowness on tests of speed and dexterity, greater for the left hand.

5. Marked motor tremor.

6. Impaired novel problem solving, on tests of hypothesis testing, planning, organization, and set shifting (mild to moderate).

Areas of preserved functioning include: orientation, simple visual memory, receptive language, spatial and constructional skills (allowing for tremor), reading, written arithmetic, fund of knowledge, and sensory-perceptual functions.

Assuming that the patient's medical history is negative for significant disease (brain tumor, cancer, etc.) and assuming that other etiologies have been ruled out (i.e., Parkinson's Disease, other subcortical disease) via medical, neurological, and radiological/laboratory exams, then diagnostic impression would be motor, memory and cognitive impairments from probable solvent/toxin exposure. This pattern of impairments (peripheral and cognitive) is common in patients who have had chronic exposure. Her MRI report of central atrophy, and reported emotional changes are also consistent with this diagnosis.

The patient's impairments are debilitating, and rehabilitation is advised. A physiatric workup, and possible recommendation to physical therapy and cognitive therapy should be considered.

MossRehab Hospital, Magee Rehab, and Bryn Mawr Rehab Hospitals are all excellent resources.

Ms. Diaconu can be retested in the future if necessary, to document her progress.

*Terri Morris* PhD, ABPN, ACPN
───────────────────────────────
Terri Morris, Ph.D., ABPN, ACPN
Diplomate in Neuropsychology
Director-Neuropsychology Laboratory
Fellow-American College of Professional Neuropsychology